**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| TRACELINK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-01197-AJT-IDD |
| | ) | |
| | ) | |
| HEALTHCARE DISTRIBUTION ALLIANCE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**<u>BRIEF IN SUPPORT OF HEALTHCARE DISTRIBUTION ALLIANCE'S MOTION TO
DISMISS PURSUANT TO RULE 12(b)(6)</u>**

# TABLE OF CONTENTS

INTRODUCTION.............................................................................................................. 1

STATEMENT OF THE CASE........................................................................................... 4

LEGAL STANDARD ........................................................................................................ 5

ARGUMENT...................................................................................................................... 7

I.      THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A CONSPIRACY TO
BOYCOTT TRACELINK. ...................................................................................... 7

      A.      TraceLink's Allegations of a Group Boycott Conspiracy are Implausible,
Conclusory, and Contradicted by the Complaint's Factual Allegations. ........ 8

      B.      The Complaint Does Not Allege the Concerted Action or Agreement That
Section 1 Requires....................................................................................... 11

      C.      HDA's Licensing Agreements with Origin Users are Mischaracterized by the
Complaint and Do Not Reveal a Boycott in Any Event.................................. 15

      D.      HDA's Members Do Not Conspire Simply by Belonging to a Trade
Association. .................................................................................................. 18

II.     THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A CONSPIRACY TO
MONOPOLIZE THE MARKET FOR HEALTHCARE COMPLIANCE
SOFTWARE.......................................................................................................... 20

      A.      TraceLink's Allegation of a Conspiracy to Monopolize Is Just as Implausible
as its Group Boycott Theory. ....................................................................... 21

      B.      In Any Event, the Complaint Once Again Fails to Plausibly Allege the
Requisite Conspiracy or Agreement Between HDA and its Members. ......... 24

III.   TRACELINK'S VAGUE AND CONCLUSORY ALLEGATIONS OF HARM TO
COMPETITION DO NOT PLAUSIBLY ESTABLISH ANTITRUST INJURY..... 25

IV.   THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE INTERFERENCE WITH
TRACELINK'S BUSINESS RELATIONS................................................................ 27

CONCLUSION ................................................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998) .............. 10

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004)..................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 6, 7

*Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 635 F. Supp. 534 (D.D.C. 1986) ................................................................................................................................................ 19

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)..................................... 13, 18

*Barry v. Blue Cross of Cal.*, 805 F.2d 866 (9th Cir. 1986).......................................................... 15

*Basnight v. HRSA-ILA*, No. 04-0782, 2006 WL 2850650 (E.D. Va. Sept. 28, 2006) ........... 16, 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... passim

*Beydoun v. Clark Const. Int'l, LLC*, 72 F. App'x 907 (4th Cir. 2003) ....................................... 12

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)................................... 6, 10

*Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176 (4th Cir. 2003) ...................................... 20

*Cheche v. Wittstat Title & Escrow Co., LLC*, 723 F. Supp. 2d 851 (E.D. Va. 2010) .................... 6

*Clatterbuck v. City of Charlottesville*, 708 F.3d 549 (4th Cir. 2013) ....................................... 6, 7

*Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208 (9th Cir. 1987).................. 10

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988) ..................... 19

*Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499 (4th Cir. 2002) ............................... 13

*Cooper v. Forsyth Cty. Hosp. Auth., Inc.*, 789 F.2d 278 (4th Cir. 1986)..................................... 12

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002)......................................................... 18

*Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313 (Va. 2014) ................................... 27

*Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867 (Va. 2011)............................. 28

*E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443 (E.D. Va. 2009)...... 25

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ................................................ 17

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009) .............................................................. 6, 7

*Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407 (D.D.C. 1988)........................................ 10

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159 (4th Cir. 2016)............................................... 16

*Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700 (E.D. Va. 2004)....................... 28

*Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532 (7th Cir. 1986) ................................. 23

*Hinton v. Trans Union, LLC*, 654 F. Supp. 2d 440 (E.D. Va. 2009) ............................................ 6

*Human Res. Inst. of Norfolk, Inc. v. Blue Cross of Virginia*, 498 F. Supp. 63 (E.D. Va. 1980)... 23

*In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517 (4th Cir. 2003) .......................................... 22

*Korea Kumho Petrochemical v. Flexsys Am. LP*, No. 07-01057, 2007 WL 2318906 (N.D. Cal. Aug. 13, 2007) ............................................................................................................................. 26

*Levine v. McLeskey*, 164 F.3d 210 (4th Cir. 1998) ........................................................................ 8

*Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc*., 824 F.2d 582 (8th Cir. 1987) 18

*Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275 (4th Cir. 2012) ............................................... 12

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293 (S.D.N.Y. 2004) ... 26

*Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699 (E.D. Va. 2003) ....................... 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986)............................... 8, 18

*Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375 (Va. 1997) ............................ 28

*MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835 (5th Cir. 2015)........................................ 18

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ............................................. 15, 24

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524 (4th Cir. 1989) ......................................................................................................................................... 23

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009).................... 12

*Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007) .................................................... 25

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985)............ 14

*Nynex Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ................................................................. 14, 25

*Oksanen v. Page Memorial Hosp*., 945 F.2d 696 (4th Cir. 1991) ................................................ 20

*Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012) ..................................... 11

*Scharpenberg v. Carrington*, 686 F. Supp. 2d 655 (E.D. Va. 2010) .............................................. 7

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ............................ 5, 11, 14

*Thompson Everett, Inc. v. Nat'l Cable Adver.*, 57 F.3d 1317 (4th Cir. 1995) ....................... 25, 26

*Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*, 983 F. Supp. 2d 700 (E.D. Va. 2013).............. 7

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398 (2004) ............. 23

*Vincent v. Reynolds Meml Hosp., Inc.*, 930 F.2d 913, 1991 WL 58454 (4th Cir. 1991)............. 20

*Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599 (4th Cir. 2009) ....................................... 7

*White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98 (4th Cir. 1987) ......................................... 21

*Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169 (E.D. Va. 1995) ................... 8, 21, 22

**Statutes**

15 U.S.C. § 1 ................................................................................................ 7, 8, 20

15 U.S.C. § 2 ...................................................................................................... 20

Fed. R. Civ. P. 12 ................................................................................................. 6

Fed. R. Civ. P. 8 .................................................................................................. 6

Fed. R. Evid. 201 .......................................................................................... 16, 20

Va. Code § 59.1-9.5 ............................................................................................. 8

Va. Code § 59.1-9.6 ........................................................................................... 20

**INTRODUCTION**

With this suit, TraceLink asks the Court to accept a series of farfetched theories in support of an implausible conspiracy in which *purchasers* inexplicably conspire to *reduce* competition among sellers. In TraceLink's Complaint, routine marketing is labeled as "coercion," and the very hallmark of competition, customer choice, is seized upon as evidence of antitrust injury. The facts alleged by TraceLink—and common sense—tell a different story. With the legal conclusions, bare assertions, and implausible assessments stripped away, an entirely pro-competitive narrative emerges, one which makes clear that TraceLink has failed to state a single claim for relief.

Specifically, a federal law enacted in 2013—the Drug Supply Chain Security Act ("DSCSA")—requires the development, over a ten-year period, of an electronic, interoperable system for the "tracing" of prescription drug products through the pharmaceutical supply distribution chain in the United States. Plaintiff TraceLink developed a software platform, called the Life Sciences Cloud, that provides its customers with a "track and trace" solution to meet the DSCSA's requirements. HDA, a voluntary and not-for-profit trade association, contracted with a software developer to create a simpler tool to help companies in the pharmaceutical supply chain comply with certain aspects of the DSCSA's electronic data exchange requirements. That product, known as Origin, merely facilitates the collection and communication of Global Trade Item Numbers ("GTINs") and associated master data used to identify each pharmaceutical product at all packaging levels so supply chain participants can effectively read and understand barcodes and electronic transactions related to those products, as the law requires. Origin does not provide "track and trace" services, such as those provided by TraceLink. Both TraceLink and HDA have marketed their respective products. Underlying TraceLink's Complaint is a single and simple grievance: some customers have chosen to use Origin.

According to TraceLink, HDA's ability to license Origin to some of its members cannot be explained by the forces of market competition or by customer preference, but rather by a vast conspiracy between HDA and its wholesale distributor member companies to exclude TraceLink from the market for DSCSA compliance software, to secure a monopoly for a not-for-profit trade association, and to deprive TraceLink of business by improper means. TraceLink offers this assessment in conclusory fashion, neglecting to supply any facts to support its theory. In fact, Plaintiff has not even sufficiently alleged the legal basis for its Complaint, by failing, for instance, to properly allege market power in the relevant market. In place of factual support, TraceLink fills the Complaint with irrelevant allegations concerning HDA's development of industry data-exchange standards not at issue, the bidding process by which HDA selected its software developer, and a mischaracterization of the terms of the publicly available Origin software license agreements (which are considered part of the Complaint under the law of this Circuit).

Equally glaring is TraceLink's failure to offer any explanation as to why either HDA or its members would pursue such an implausible conspiracy. For instance, TraceLink offers no plausible explanation (nor can it) as to why HDA's members—who are *customers* of DSCSA compliance software—would conspire to *reduce* competition in that market. It fails even to suggest a rational economic motivation for sophisticated multinational distributors to conspire to secure a monopoly—for a non-profit trade association, no less—in a software market in which they do not compete. Of course, no such motivation could plausibly exist because the distributors are the *consumers* of the software at issue and would be *harmed* by less competition in the relevant software market. The entire premise of TraceLink's proffered antitrust conspiracy—i.e., that a defendant conspired to reduce competition and create a monopoly in a

market in which it is the buyer—has been adjudicated by courts to be implausible as a matter of law.

TraceLink also fails to explain how or why HDA was able to secure and maintain cooperation from such companies in the alleged unlawful scheme. Contrary to TraceLink's representations to the Court in its Complaint, the Origin license agreements referred to and relied on in the Complaint (attached to this brief as Exhibits A and B) do *not* contain any of the supposedly anticompetitive language cited by TraceLink. Nothing in the agreements prevents TraceLink from competing fully and fairly in the relevant market. The absence of either motivation or mechanism for this alleged conspiracy, which defies both common and economic sense, is likewise fatal to TraceLink's Complaint.

Ultimately, this is a simple case. TraceLink lost business it had hoped to win. And while TraceLink clearly bristles at the notion of competing for business against a non-profit trade association, nothing in TraceLink's Complaint suggests that a conspiracy or anticompetitive conduct—rather than competition—is to blame. TraceLink aims to obscure this wholly procompetitive narrative by peppering its Complaint with antitrust buzzwords—but to no avail. It is simply not anticompetitive to develop a proprietary product, nor to choose one vendor over another to do so, nor to protect the intellectual property that underlies it. And it is certainly not anticompetitive to urge potential customers to adopt that product to the exclusion of other, competing products. The facts alleged by TraceLink portray a market functioning as it should— with competition, with options for customers, and, potentially, with winners and losers.

In the end, the only anticompetitive conduct in this case is TraceLink's attempt to drive out a competitor by dragging HDA into frivolous, but cripplingly expensive, antitrust litigation. This Court should halt that effort now and dismiss TraceLink's Complaint.

## STATEMENT OF THE CASE

The following facts are drawn from TraceLink's Complaint and are presumed to be accurate for the purpose of this motion to dismiss. The DSCSA imposes new and escalating requirements to build an electronic system to identify and follow prescription pharmaceuticals from manufacturer to dispenser. *See* Compl. ¶¶ 27-29. One DSCSA requirement is that, beginning in 2017, each individual saleable prescription drug unit must be "serialized" with a unique "product identifier" in a machine-readable bar code that includes, among other things, a standardized product description. *See id.* ¶¶ 30, 33. Ultimately, this information will be passed electronically down the pharmaceutical supply chain—from manufacturer to wholesale distributor to dispenser—each time the prescription drug changes ownership. *See* Compl. ¶¶ 26-35.

To help companies meet these new DSCSA obligations, TraceLink designed and developed a product known as the Life Sciences Cloud, a "tailor-made" software platform that enables companies throughout the supply chain to record and exchange the law's required information. *See id.* ¶¶ 36-39. The Life Sciences Cloud provides companies with a host of additional information as well and "has quickly become a significant pharmaceutical track-and-trace network." *Id.* ¶ 37.

HDA is a trade association representing wholesale distributors of pharmaceutical products, *id.* ¶ 1, whose distributor members are *consumers* of track-and-trace software products, not suppliers. After consultation with its members, HDA identified a need for a more simple solution to facilitate the collection and communication of pharmaceutical identification codes (GTINs) throughout the supply chain. Thus, HDA "ventured into the commercial arena" and developed Origin, a simple product that is "solely a data repository that identifies specific packages of drugs that have been put into the supply chain." *Id.* ¶¶ 2, 44-49. Origin thus "has

substantially less utility" than TraceLink's Life Sciences Cloud, which includes the same product information as Origin as well as "information regarding, among other things, when and to whom the [pharmaceutical] product was sold." *Id.* ¶ 48. Also, unlike Origin, Life Sciences Cloud does not "[rely] substantially upon US-based technical nomenclature and product master data," and thus is suitable for international transactions. *Id.*

TraceLink alleges that, after developing Origin, HDA "request[ed]"—"at least once"— that its members not only adopt it for their own use, but also urge their "business partners" to do the same. *Id.* ¶ 49. Because a "compliance solution" such as Origin "becomes more valuable to life science supply chain businesses as more of its business partners use that product," several of HDA's members who elected to use Origin have sought to implement it across their respective networks. *Id.* ¶¶ 49, 52. The resulting use of Origin has potentially resulted in fewer subscriptions to the Life Sciences Cloud. *Id.* ¶ 54.

In October 2017, TraceLink filed the instant suit, alleging that in developing and marketing Origin, HDA both conspired with its members to decrease competition in the market for DSCSA compliance software in violation of state and federal antitrust laws, and tortiously interfered with existing and prospective contracts for the Life Sciences Cloud. HDA now moves to dismiss TraceLink's Complaint.

## LEGAL STANDARD

Weeding out inadequate complaints at the pleading stage is particularly critical "in antitrust cases" given "the unusually high cost of discovery" in that field. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007). The Fourth Circuit—"well aware of the substantial cost that discovery in an antitrust case can impose"—recently reaffirmed this principle and "recognize[d] that the cost largely falls on the defendants." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 434 (4th Cir. 2015). Here, TraceLink seeks to inflict such cost upon a not-

for-profit trade association particularly ill-positioned to bear it, in a transparent attempt to force a concession, weaken a new competitive threat, and enhance its own market position in the process. The Fourth Circuit has, in fact, expressly warned of the "extortionate effect" of discovery costs, which "compel[] some defendants to enter early settlements even in meritless suits." *Id.* Stated plainly: "'[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.'" *Twombly*, 550 U.S. at 558 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

A familiar standard guides that inquiry. A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Where a complaint fails "to state a claim upon which relief can be granted," it is subject to dismissal under Fed. R. Civ. P. 12(b)(6). Such "threshold dismissal . . . must be granted unless the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is *plausible* on its face.'" *Hinton v. Trans Union, LLC*, 654 F. Supp. 2d 440, 445 (E.D. Va. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)) (emphasis added). A complaint meets this "facial plausibility" standard "by pleading '*factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (emphasis added). In this way, a motion to dismiss pursuant to Rule 12(b)(6) tests "the legal sufficiency of the allegations in the plaintiff's complaint." *Cheche v. Wittstat Title & Escrow Co., LLC*, 723 F. Supp. 2d 851, 854 (E.D. Va. 2010) (citing *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009)).

To be sure, "a district court must construe" a complaint's "well-pled facts in the light most favorable to the plaintiff." *Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*, 983 F. Supp. 2d 700, 703 (E.D. Va. 2013). But this deference does not extend to "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678. And courts have long noted their obligation to "disregard 'unwarranted inferences, unreasonable conclusions, [and] arguments'" when judging a complaint's sufficiency. *Scharpenberg v. Carrington*, 686 F. Supp. 2d 655, 658 (E.D. Va. 2010) (quoting *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n. 26 (4th Cir. 2009)). Ultimately, "determining whether a complaint states on its face a plausible claim for relief and therefore can survive a Rule 12(b)(6) motion will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Francis*, 588 F.3d at 193 (quoting *Iqbal*, 556 U.S. at 679). And where the court concludes that the factual allegations do not "'nudg[e the] claims across the line from conceivable to plausible,'" the door to the federal discovery apparatus should remain closed, and the complaint should be dismissed. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (quoting *Twombly*, 550 U.S. at 570).

## ARGUMENT

TraceLink's Complaint fails to state a cause of action on any of its six Counts and should be dismissed in its entirety as a result.

## I.     THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A CONSPIRACY TO BOYCOTT TRACELINK.

In its first and third Counts, TraceLink alleges a group boycott by HDA and its members in violation of both Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Virginia Antitrust Act,

Va. Code § 59.1-9.5.[1]  *See* Compl. ¶¶ 82-91, 100-08.  Yet the boycott theory TraceLink advances makes no economic sense, and the Complaint fails to supply any facts to overcome its facial implausibility.  According to TraceLink, HDA's distributor members conspired with one another to reduce competition in a market in which they are purchasers, and to boost profits that cannot even be realized, let alone shared amongst the members themselves.  Conclusory allegations of such a self-defeating and improbable conspiracy are entirely insufficient to stave off dismissal.  Unsurprisingly, this fundamental implausibility infects the entirety of TraceLink's Section 1 claim.  Not only does the Complaint fail to offer any facts establishing the "contract, combination . . . or conspiracy" Section 1 requires, 15 U.S.C. § 1, but those facts it does allege actually undercut TraceLink's path to recovery.  Neither the standard licensing agreement accompanying Origin, for instance, nor HDA's status as a trade association support the existence of the conspiracy TraceLink claims.  Counts 1 and 3 should be dismissed.

**A.  TraceLink's Allegations of a Group Boycott Conspiracy are Implausible, Conclusory, and Contradicted by the Complaint's Factual Allegations.**

TraceLink's Complaint simply does not advance a viable group boycott theory.  In conclusory fashion, it concocts a conspiracy that makes neither economic nor common sense, and for which the alleged key players lack any motivation.  Where a "plaintiff . . . alleges [an] irrational or economically implausible antitrust conspiracy," he must also "come forward with particularly persuasive evidence of a conspiracy."  *Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1175 n.9 (E.D. Va. 1995).  *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that "if the factual context renders respondents' claim

---

[1] Virginia Code § 59.1-9.5 provides that "[e]very contract, combination or conspiracy in restraint of trade or commerce of this Commonwealth is unlawful."  In light of the similarities between that provision and Section 1 of the Sherman Act, courts have analyzed them in concert and applied federal standards to the state-law claim.  *See Levine v. McLeskey*, 164 F.3d 210, 214 (4th Cir. 1998).  This brief will follow the same convention.

implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary" to survive summary judgment).    TraceLink fails to offer *any* evidence of a conspiracy—let alone evidence that might be characterized as "particularly persuasive." TraceLink's group boycott claims fail for this reason.

At base, TraceLink alleges that HDA and some of its members—the so-called "Big Three," in particular—conspired to exclude TraceLink's track-and-trace software from the market, and to instead advance a simpler product called Origin, which HDA itself developed. But the Complaint offers no facts that would explain why HDA's alleged member co-conspirators would pursue such concerted action.

As TraceLink alleges, Origin "is solely a data repository that identifies specific packages of drugs that have been put into the supply chain." Compl. ¶ 48.  Such products help distributors "manage the flow of this data across a wide variety of networks, including internally within a company, among supply chain partners, and with the government." *Id.* ¶ 35.  Why a distributor might select Origin is self-evident; a company may well desire only the functionality required to identify specific packages of drugs put into the supply chain, and not the more advanced—and presumably more expensive—features of TraceLink's product.  *See id.* ¶ 48 (describing the additional functionality and utility of the Life Sciences Cloud).  But the Complaint discloses no reason why one distributor would have an interest in what software a *competing distributor* uses, much less why any distributor would want to see *fewer* software options available.

It makes no economic sense for HDA's members to conspire either to prop up a single software product, or to eliminate competition from the alleged DSCSA compliance software market.  In fact, that distributor would be harming itself with no possibility of future gain by

driving competing software vendors from the market. Simply put, if a distributor's preference is for Origin, the rational decision is to simply purchase Origin, not to conspire to eliminate competition from the market in which Origin competes. Courts have routinely—and resoundingly—rejected similar allegations as implausible as a matter of law. *See, e.g.*, *Car Carriers, Inc*., 745 F.2d at 1109-10 ("[I]t is inherently implausible that Ford, as a buyer . . . would conspire to allow its new carrier, Nu-Car, to charge noncompetitive prices; the plaintiffs are alleging, in essence, that Ford conspired to injure itself."); *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952-53 (9th Cir. 1998) (rejecting antitrust claim based on theory that buyers would conspire to give monopoly power to a single supplier in the market, because "[a]ntitrust claims must make economic sense" and this theory "makes no economic sense"); *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir. 1987) (allegation that buyer conspired with supplier to make supplier the exclusive supplier in the market was "illogical" because "a restriction on competition in the parts delivery market would have raised prices in a market in which [buyer] purchased services."); *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422 (D.D.C. 1988) ("[T]hat a purchaser . . . would conspire with a supplier . . . to facilitate the supplier's monopolization of the market to allow, for example, the supplier to charge the purchaser non-competitive, monopoly prices is sufficiently implausible to limit any inference of an antitrust violation.").

In an attempt to paper over this deficiency, TraceLink alleges that HDA's members somehow "have a pecuniary interest in the success of Origin." Compl. ¶ 5. Yet the Complaint offers no facts in support of this bald assertion—nor could it. As TraceLink elsewhere acknowledges, HDA is a not-for-profit trade association and a legally distinct entity from its members. *See id.* ¶ 11. And it is HDA—*not* its members—that developed and now markets the

Origin product.  *See id.* ¶¶ 3, 44, 50.  TraceLink fails to allege how HDA's members have a

"pecuniary interest" in a product sold by a legally distinct, non-profit association and fails to

identify any mechanism by which "acting as the supplier of Origin" enables non-profit HDA "to

reap monies for itself and its . . . members."  *Id.* ¶ 7.[2]  But more to the point, it is entirely

implausible to suggest that sales of Origin could ever supply a motivation for HDA's members to

conspire to violate state and federal antitrust laws.  As TraceLink itself alleges, those members

are in the business of providing "pharmaceutical sourcing and distribution services" worldwide.

*See id.* ¶¶ 14-16.  They are among "the largest" such companies "globally," and TraceLink

would have this Court accept as plausible the notion that these companies conspired to exclude a

software company from a market in which they do not compete, simply to advance a nascent

"data repository" which they do not sell.  This theory falls well short of "plausible" and no facts

"nudg[e]" it anywhere close to that line.  *Twombly*, 550 U.S. at 570.

**B.    The Complaint Does Not Allege the Concerted Action or Agreement That Section 1 Requires.**

TraceLink's group boycott claims further fail because the Complaint has not supplied

"enough factual matter (taken as true) to suggest that [the requisite] agreement was made" to

satisfy Section 1.  *SD3*, 801 F.3d at 424 (internal quotations omitted).  Because Section 1

"applies only to *concerted* action," *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 284

(4th Cir. 2012) (emphasis added), TraceLink must plead—and ultimately present—either "direct

or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a

*common* scheme designed to" exclude TraceLink from the market.  *Cooper v. Forsyth Cty. Hosp.*

---

[2] HDA does not suggest, of course, that non-profit entities are immune from the antitrust laws, but rather notes that TraceLink fails to offer any plausible reason why HDA's members would conspire to increase revenue from Origin licenses when that revenue would, at best, merely offset the operating costs of a voluntary trade association to which they, and hundreds of other companies, belong.

*Auth., Inc.*, 789 F.2d 278, 281 (4th Cir. 1986) (emphasis added) (internal quotations omitted); *see also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 225–26 (4th Cir. 2004) ("A plaintiff can offer direct or circumstantial evidence to prove concerted action."); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 280 (4th Cir. 2012) (affirming R. 12(b)(6) dismissal of antitrust conspiracy claim where "[t]here are no allegations in this case suggestive of . . . circumstantial evidence of conspiracy"); *Beydoun v. Clark Const. Int'l, LLC*, 72 F. App'x 907, 916 (4th Cir. 2003) (affirming dismissal of civil conspiracy claim because "[m]ere conclusions that fail to offer direct or circumstantial evidence of an unlawful agreement between the alleged conspirators are insufficient" (internal quotation marks omitted)).  TraceLink's Complaint offers neither.  To be sure, it baldly asserts that "HDA and its co-conspirators . . . conspired to unreasonably restrain trade."  Compl. ¶ 6; *see also id.* ¶ 56.  But no *facts* plausibly support this conclusion, and neither the "elements of a cause of action," nor "bare assertions devoid of further factual enhancement . . . constitute well-pled facts for Rule 12(b)(6) purposes."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *see also Twombly*, 550 U.S. at 557 (holding that a "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality").

First, TraceLink alleges no facts that would constitute direct evidence of an express agreement or conspiracy.  *See Am. Chiropractic Ass'n*, 367 F.3d at 226 (characterizing direct evidence as a "smoking gun").  It alleges no meeting in which HDA and its members hatched their alleged plan to boycott TraceLink and exclude it from the relevant market—indeed, not even so much as a conversation to that effect.  Instead, TraceLink points to a series of red herrings surrounding the development of Origin—adorned with dates of *its own* alleged meetings and presentations—in a futile attempt to create the illusion of a conspiracy.

HDA excluded TraceLink from its RFP when developing Origin, the Complaint alleges, despite the fact that TraceLink had "specialized expertise" in the area. *See* Compl. ¶¶ 44-45. HDA began developing Origin, the Complaint continues, only after "TraceLink presented a confidential plan to develop a product with certain similarities to Origin at least twice to several members of the HDA." *Id.* ¶ 45. And finally, TraceLink alleges, Origin was designed to be a "closed proprietary platform," rather than "an open product for data exchange." *Id.* ¶¶ 46-47. These allegations are of no moment. This is not a case about the creation of "objective industry standards," and so TraceLink's charge that it was denied "due processes" as a result of HDA's "discriminatory" behavior is nothing more than an attempt to distract. *See id.* ¶¶ 44-45.

Taken as true, the allegations concerning Origin's development establish only that HDA designed a repository of certain pharmaceutical product information that would compete with TraceLink's Life Sciences Cloud with regard to the provision and management of that information (though differing from it in many respects), and that it worked with a third-party vendor (and not with TraceLink) to develop that product. Those facts show the workings of a competitive marketplace, and the efforts of one supplier to introduce a new and competitive product therein—*not* a Section 1 violation. TraceLink's qualms about the results of those efforts—that they failed to yield "the highest quality solution," for instance, or that Origin "lacks the flexibility to be used in international transactions," *id.* ¶¶ 44, 48—should be made the subject of a pitch to prospective customers, rather than a Sherman Act complaint. As courts have long noted, "'[t]he antitrust laws were enacted for the protection of competition, not competitors.'" *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)). TraceLink must allege an actual agreement by HDA and its members to "cut off access to a supply, facility, or market necessary

to enable [TraceLink] to compete" in the relevant market, *SD3*, 801 F.3d at 433 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)).  The mere attempt by HDA to develop a new product and introduce it into the market represents pro-competitive conduct, not an anticompetitive agreement.

The Complaint supplies no circumstantial evidence of a conspiracy either.  Without direct evidence of an agreement, a complaint must offer circumstantial evidence that plausibly "tend[s] to exclude the possibility of independent action."  *Twombly*, 550 U.S. at 554.  TraceLink's Complaint falls well short of this mark, alleging only independent activity that is entirely consistent with normal trade association dynamics.  TraceLink asserts, for instance, that "HDA urged its wholesaler distributor members to mandate that their business partners use only the Origin product."  Compl. ¶ 49.  What TraceLink describes, however, is simply ordinary unilateral marketing.  Indeed, the best TraceLink can offer in this regard is that "HDA made this *request*" of its members "at least *once*."  *Id.* (emphases added).  Even if true, a single request by HDA that its members adopt the Origin product it had just developed and use it in their supply chain plainly is not evidence of a conspiracy or concerted action of any kind.

With respect to the members themselves, TraceLink's allegations are similarly deficient.  TraceLink asserts only that they "have, in turn, mandated that their business partners use the Origin product in their dealings . . . rather than TraceLink."  *Id*.  In other words, some unspecified number of members responded to HDA's marketing efforts and elected to license Origin.  *Id.*  Of course, the simple decision to purchase one product does not implicate the buyer in a conspiracy to boycott another, competing product, because "[t]he freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage."  *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998).  TraceLink's attempt to cast

these decisions as somehow "foreclosing[] competition" in the market for DSCSA compliance software is unavailing. Compl. ¶ 1. As one court noted, "[w]hen a consumer contracts to buy services from one [supplier], the consumer will then have little or no demand for the services of" another supplier. *Barry v. Blue Cross of Cal.*, 805 F.2d 866, 872 (9th Cir. 1986). That "does not mean," however, "that the parties have agreed to an unlawful concerted refusal to deal." *Id.*

What is more, the Complaint offers no facts to suggest that the decision on the part of HDA's members to purchase Origin and implement it in their supply chains was concerted in the first instance. Indeed, quite the opposite: the Complaint acknowledges that a "particular compliance solution becomes more valuable to life science supply chain businesses as more of its business partners use that product." *Id.* ¶ 52. Thus, once an HDA member chose Origin, the alleged decision to then "mandate[] that their business partners" do the same—by TraceLink's own measure—is entirely rational and makes very good business sense. *Id.* ¶ 49. That more than one member allegedly followed this path suggests only "lawful parallel conduct [that] fails to bespeak unlawful agreement," *Twombly*, 550 U.S. at 556, and not a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

C. **HDA's Licensing Agreements with Origin Users are Mischaracterized by the Complaint and Do Not Reveal a Boycott in Any Event.**

In an effort to muddy the waters once again, TraceLink points to licensing agreements between HDA and Origin users as further evidence of a group boycott conspiracy. *See* Compl. ¶¶ 50-52. But these agreements—which TraceLink asserts contain "non-compete clauses," *id.* ¶ 50—simply do not reflect a refusal to deal with TraceLink, and are in no way anticompetitive. Indeed, the provisions on which TraceLink seizes reveals nothing more than HDA's effort to protect the data within Origin from theft or unauthorized copying by noncustomer third parties:

## 5. Restrictions

> User will not and will not permit others to directly or indirectly: . . . (g) permit direct or indirect access or use of the Database or Data in any way that circumvents the Agreement; [or] (h) build or permit to be built a product or service competitive or create derivative works, for profit and commercial use outside of the company with the Database or the Origin HDA Product Data Source Service . . . .

Origin HDA Product Data Source User Agreement § 5(g), (h) ("User Agreement") (attached as **Exhibit A**); *see also* Origin HDA Product Data Source Contributor Agreement § 8(f), (g) (containing similar language) ("Contributor Agreement") (attached as **Exhibit B**).[3] It is, of course, entirely reasonable for a company that has invested time and money to compile and maintain "a data repository" to endeavor to protect that compilation from wholesale theft. *Id.* ¶ 48.

But more to the point, the allegedly exclusionary User and Contributor Agreements do *not* preclude or prohibit anyone from using TraceLink's Life Sciences Cloud or any competing product in any way. A customer may freely elect to use Origin to obtain product information from the data repository and at the same time use the Life Sciences Cloud for its other traceability needs.[4] And because HDA's intellectual property extends only to the "selection and arrangement" of the data within Origin, the prescription drug manufacturers that contribute the

---

[3] The Court may consider the foregoing exhibits in conjunction with this motion to dismiss because each is "explicitly incorporated into the complaint by reference." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *see also* Compl. ¶ 50. Moreover, both the User Agreement and the Contributor Agreement are also appropriate for judicial notice as they are publicly available for download via the Internet and are not subject to reasonable dispute. *See Basnight v. HRSA-ILA*, No. 04-0782, 2006 WL 2850650, at *6 (E.D. Va. Sept. 28, 2006); Fed. R. Evid. 201. *See also* Origin, *Product Info*, http://hdaorigin.com/product-info/ (last visited Dec. 28, 2017).

[4] In fact, companies will need to supplement their use of Origin to comply with the DSCSA. As the Complaint alleges, Origin is "solely a data repository that identifies specific packages of drugs that have been put into the supply chain." Compl. ¶ 48. "Congress enacted" the DSCSA "to facilitate the *tracing* of prescription drug products through the pharmaceutical supply chain," *id.* ¶ 27 (emphasis added), and Origin is no substitute for the technology needed to actually exchange and manage transactions related to the change of ownership of a product.

underlying data remain free to provide it directly to competing companies, including TraceLink. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (noting that "the copyright in a factual compilation is thin," and that "a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement"). TraceLink attempts to convert HDA's standard intellectual property protection clause into an illegal agreement by asserting that the clause imposes "opportunity costs" on potential TraceLink customers who may need to "re-enter their data" into other systems if they choose to purchase more than one. Compl. ¶ 50. This argument fails. The mere fact that a customer who has already purchased one product to accomplish a task may incur additional costs if it chooses also to use a second product is wholly unexceptional.

TraceLink's mischaracterization of the User and Contributor Agreements as exclusionary is especially misleading because the agreements expressly *permit* Origin users to give third parties like TraceLink access to the Origin database for purposes of rendering services to users. *See, e.g.*, Ex. A (User Agreement) at § 1 (permitting "subcontractors, independent contractors and agents of User" to "access and use the [Origin] Database" for "their customer's internal business uses"). In other words, the Agreements plainly allow TraceLink to provide software services to its distributor customers and to access the Origin database on behalf of its customers—the complete opposite of what TraceLink alleges in its Complaint. *See* Compl. ¶ 50 (alleging that the Agreements "prevent licensees from providing track and trace product data from Origin's GTIN database to third parties").

What is more, each licensing agreement between HDA and an Origin user establishes—*at best*—a single vertical agreement not to deal. And "purely vertical refusals to deal" do not

establish a group boycott. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 849 (5th Cir. 2015). They instead reflect "exclusive dealing agreements," which "are not per se unlawful" because they "frequently have procompetitive justifications, such as limiting free riding and increasing specialization." *Id.*; *see also Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir. 1987) (holding that "refusals to deal involving no concerted action between horizontal competitors do not constitute *per se* unlawful group boycotts"). Nothing in the Complaint suggests that the various User Agreements between HDA and Origin users have a *horizontal* component of any kind. This sort of "rimless wheel conspiracy is not a single, general conspiracy," *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002), and cannot establish the concerted group boycott TraceLink presses.

In any event, to the extent the User and/or Contributor Agreements *did* evince some sort of horizontal agreement not to compete in the market for track-and-trace software, that agreement would actually *benefit* TraceLink by eliminating potential TraceLink competitors. Plainly then, TraceLink would lack standing to challenge such an agreement. *See Atl. Richfield Co.*, 495 U.S. at 337 (no "antitrust injury" where challenged conduct "would have worked to [plaintiff's] advantage"); *Matsushita*, 475 U.S. at 583 (holding that a competitor in a relevant market "cannot recover for a conspiracy" that, "though harmful to competition, actually benefit[s] competitors"). Thus, even under TraceLink's mischaracterization, the Agreements offer no plausible relief.

> **D.      HDA's Members Do Not Conspire Simply by Belonging to a Trade Association.**

Ultimately, TraceLink aims to sustain its Complaint on little more than the allegation that HDA is a trade association that is "dominated by the Big Three." Compl. ¶ 13. HDA, it alleges, "serves as the conspiratorial conduit for the collective actions of its members." *Id.* ¶ 75. But

"mere membership in a trade association does not give rise to an inference of conspiracy." *Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 635 F. Supp. 534, 536 (D.D.C. 1986); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst*., 846 F.2d 284, 293-94 (5th Cir. 1988) (noting that "a trade association is not by its nature a 'walking conspiracy'"). Rather, a plaintiff must ultimately offer "[p]roof of knowing, intentional participation in the illegal activities of the association" to demonstrate a conspiracy between that association and its members. *Ass'n of Retail Travel Agents*, 635 F. Supp. at 536; *id.* at 536-37 (finding that the plaintiff "alleged no facts to support its allegation that ARTA enjoyed the knowing participation of any of its members in illegal activity in restraint of trade"). TraceLink attempts to meet this burden by alleging that "HDA has used its 'association' status to coerce or persuade its members to use Origin" and not the "products offered by private competitors," Compl. ¶ 4, but this baseless theory never progresses beyond bare conclusion. Indeed, not only does the Complaint supply no facts to confirm HDA's purported clout, it actually undercuts it. *See id.* ¶ 49 (alleging only that HDA "request[ed] at least once" that its members adopt Origin). TraceLink offers nothing—no "policing" mechanism, no threat of consequence, no express tie—that would convert HDA's request into evidence of an anticompetitive conspiracy.

This is to say nothing of the sheer implausibility of suggesting that a voluntary, not-for-profit trade association such as HDA could successfully coerce its hundreds of members to do anything—particularly here, where those members include not only sophisticated distribution companies, *see* Compl. ¶¶ 14-16, but also 137 of the world's leading pharmaceutical manufacturers, *see* HDA, Manufacturer, https://www.hda.org/about/membership/manufacturer (last visited Dec. 28, 2017), and more than 50 service providers as well. *See* HDA, Service

Provider, https://www.hda.org /about/membership/service-provider (last visited Dec. 28, 2017).[5] In fact, TraceLink itself is a member of HDA. *Id.* Presumably then, if there were actual facts to suggest HDA's power to conscript its members into illegal conspiracies, TraceLink would at least be aware of them. The Complaint's silence on this score speaks volumes.

TraceLink's Complaint does not plausibly establish any concerted activity in restraint of trade. Indeed, its factual allegations undermine rather than support its conclusory allegations of a conspiracy. Without the "contract, combination, or conspiracy" necessary to support its claims, 15 U.S.C. § 1, TraceLink's efforts to plead a group boycott fail. Counts 1 and 3 therefore should be dismissed.

## II. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A CONSPIRACY TO MONOPOLIZE THE MARKET FOR HEALTHCARE COMPLIANCE SOFTWARE.

In its second and fourth counts, TraceLink alleges another conspiracy between HDA and its members—this time in violation of Section 2 of the Sherman Act and § 59.1-9.6 of the Virginia Code.[6]  *See* Compl. ¶¶ 92-99, 109-17.  Section 2 targets those who "combine or conspire with any other person or persons[] to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. And while much of Section 2 applies to independent action, a "*conspiracy* to monopolize" claim under that section requires the same "conscious commitment to a common scheme" as does a "§ 1 claim." *Vincent v. Reynolds Meml Hosp., Inc.*, 930 F.2d 913, 1991 WL 58454, at *1 (4th Cir. 1991) (emphasis added) (unpublished tbl.

[5] HDA respectfully requests that the Court take judicial notice of the websites cited in the foregoing paragraph as both are publicly available and not subject to dispute. *See Basnight*, 2006 WL 2850650, at *6; *see also* Fed. R. Evid. 201.

[6] Virginia Code § 59.1-9.6 provides that "[e]very conspiracy, combination, or attempt to monopolize, or monopolization of, trade or commerce of this Commonwealth is unlawful." Given the similarities between this provision and Section 2 of the Sherman Act, courts have analyzed the two in concert and applied federal standards to the state-law claim. *See Cavalier Tel., LLC. v. Verizon Va., Inc*., 330 F.3d 176, 182 & n.* (4th Cir. 2003) (citing *Oksanen v. Page Memorial Hosp*., 945 F.2d 696, 710 (4th Cir. 1991)). This brief will follow the same convention.

op.) (citing *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 103 (4th Cir. 1987)). To ultimately "prove conspiracy to monopolize," a plaintiff "must show (1) the existence of a conspiracy to monopolize, (2) specific intent to monopolize, (3) overt acts in furtherance of the conspiracy, and (4) an effect on an appreciable amount of interstate commerce." *Williams*, 891 F. Supp. at 1175.

TraceLink's Complaint fails to state a claim for conspiracy to monopolize. Once again, it alleges—in conclusory fashion only—a conspiracy that defies economic sense, and supplies no facts to nudge it toward plausibility. Moreover, the Complaint fails to allege any facts which would establish that HDA and its members formed the required conspiracy or agreement. Counts 2 and 4 should be dismissed accordingly.

A.     **TraceLink's Allegation of a Conspiracy to Monopolize Is Just as Implausible as its Group Boycott Theory.**

TraceLink's theory that HDA and its members conspired to monopolize the software market at issue makes no more economic or logical sense than its group boycott theory. *See supra* Part I.A. Once again, TraceLink asks this Court to believe that HDA's members conspired with their non-profit trade association to reduce competition in a software market in which they do not compete. TraceLink supplies no plausible motivation for this conspiracy. Indeed, its conclusory allegation that HDA's members have a "pecuniary interest in the success of Origin," Compl. ¶ 5, is entirely unfounded and actually contradicted by the other facts alleged in the Complaint. Simply put, TraceLink's theory is that the world's largest pharmaceutical distribution companies conspired to violate state and federal antitrust laws by excluding TraceLink from a market in which they themselves do not compete, all in order to boost the profits of a not-for-profit entity. Whether couched in terms of a group boycott conspiracy or a

conspiracy to monopolize, TraceLink simply never rectifies the facial implausibility of such a scheme.

In fact, the Complaint's deficiencies are even more pronounced in the Section 2 context, because that claim requires a "specific intent to monopolize" the market at issue. *Williams*, 891 F. Supp. at 1175; *see also id.* at 1176 (dismissing, on a R. 12(b)(6) motion, plaintiff's conspiracy to monopolize claim). TraceLink fails to suggest any reason why HDA's distributor members would harbor such an intention. Nothing in the Complaint, moreover, suggests that a *monopoly* in the DSCSA compliance software market was remotely feasible for HDA and Origin. Most critically, while TraceLink brazenly and nakedly asserts that HDA "has market power in the market for DSCSA track-and-trace compliance solutions," Compl. ¶ 74, its theory as to why is entirely untenable and unsupported by any case law. HDA's purported market power, according to TraceLink, comes not from its actual share of sales in the market at issue, but rather "emanates from the market power that its members, particularly the Big Three, wield in the wholesale distribution market." *Id.* ¶ 76. In other words, TraceLink aims to establish HDA's market power in one market by alleging that multiple, distinct non-parties together have market power in an entirely different market. That is not a valid theory of market power. HDA's counsel have not been able to identify a single case holding that market power in one market can "emanate" from market power in another. In fact, the closest cases identified relate to the theory of monopoly leveraging, which has been roundly criticized by both judges and scholars, and has been all but eviscerated as an antitrust cause of action.[7] Market power depends not on some nebulous

---

[7] Under a "monopoly leveraging" theory, a defendant leverages its monopoly in one market in order to gain a competitive advantage in another, related market. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 532 (4th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006). Of course, HDA does not have a monopoly in any market, and thus lacks the ability to "leverage" anything. But even if it could, monopoly

connection to a firm with power in a related market, but rather on the defendant's "ability to raise prices above the levels that would be charged in a competitive market." *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 n.8 (4th Cir. 1989). TraceLink, moreover, offers no indication as to whether any barriers to entry would facilitate and protect a monopoly in the DSCSA compliance software market. Indeed, such barriers are unlikely to exist. As TraceLink alleges, HDA easily entered that market and TraceLink itself "quickly [became] a significant pharmaceutical track-and-trace network." Compl. ¶ 37.

As courts have observed, the "mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize," and "specific intent cannot be inferred from conduct even though its effect was to drive defendant's only competitor out of business." *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986). This is because the "very nature of unfettered competition is exclusionary to the extent that making a sale and increasing an available share of business is its object." *Id.* (internal quotation marks omitted). If "all that were required by the specific intent requirement" was "an intent to prevail generally in the market, the very competitive behavior that the antitrust laws were intended to protect would instead be prohibited." *Id.* (internal quotation marks omitted). This is, of course, not the law. Rather, the "acts from which one can infer specific intent must be essentially predatory in nature." *Id.* (internal quotation marks omitted); *see also Human Res. Inst. of Norfolk, Inc. v. Blue Cross of Virginia*, 498 F. Supp. 63, 67 (E.D. Va. 1980) ("A mere intent to prevail over rivals or to improve market position is insufficient [to establish specific intent monopolize]. Even an intent to perform acts which can be objectively viewed as tending

---

leveraging as a standalone claim "has not been recognized in this circuit nor has it received general acceptance." *Id.*; *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 415 n.4 (2004) (noting that "a claim under a 'monopoly leveraging' theory" is not viable without "a 'dangerous probability of success' in monopolizing a second market").

toward the acquisition of monopoly power is insufficient, unless it appears that the acts were not predominantly motivated by legitimate business aims." (internal quotation marks omitted)).

TraceLink offers no plausible allegations of predatory actions—taken in concert—by either HDA or its members. Indeed, as set forth above, the Complaint's allegations establish little more than that HDA developed a limited DSCSA solution for holding and managing certain product information, and then marketed it to the pharmaceutical supply chain with some success. *See supra* Part I.B. There simply is nothing predatory about such plainly procompetitive conduct. Indeed, as noted above, the only anticompetitive conduct here is TraceLink's attempt to bully a non-profit competitor out of the market by filing this frivolous and costly lawsuit.

## B. In Any Event, the Complaint Once Again Fails to Plausibly Allege the Requisite Conspiracy or Agreement Between HDA and its Members.

Once again, TraceLink's pleading deficiencies go beyond mere facial implausibility. Though the Complaint baldly asserts that the actions of HDA and its members "constitutes a conspiracy to monopolize," Compl. ¶ 93, no facts plausibly establish that such an agreement was ever formed. As set forth above, TraceLink offers neither direct nor circumstantial evidence that the alleged co-conspirators made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764; *see also supra* Part I.B. And TraceLink's core theory—that HDA and its members somehow "force[d] businesses in the life sciences supply chain to use Origin as their exclusive service," Compl. ¶ 94—is both undercut by its own allegations and entirely implausible in any event. HDA did not "force" its members to do anything; rather, as TraceLink itself concedes, it made a "request[] . . . at least once" that they adopt Origin. *Id.* ¶ 49. TraceLink alleges no facts which would reveal some mechanism by which this single request by HDA suddenly became coercion. Furthermore, it simply is not plausible to suggest that HDA's members conspired with one another to mandate the use of

Origin in their respective supply chains as they would have no incentive to do so; they would, on the other hand, have an incentive to do so *independently* because a "particular compliance solution becomes more valuable to life science supply chain businesses as more of its business partners use that product." *Id.* ¶ 52. Without facts to plausibly support the element of an agreement or concerted action, TraceLink cannot prevail on its claim for a conspiracy to monopolize. *See Nynex*, 525 U.S. at 139 (where a Section 2 conspiracy claim turned on "the very same . . . practices" alleged to have violated Section 1, the Court could "not see, on the basis of the facts alleged, how Discon could succeed on this claim without prevailing on its § 1 claim"). Counts 2 and 4 should be dismissed.

## III. TRACELINK'S VAGUE AND CONCLUSORY ALLEGATIONS OF HARM TO COMPETITION DO NOT PLAUSIBLY ESTABLISH ANTITRUST INJURY.

TraceLink's state and federal antitrust claims should be dismissed for the further reason that the Complaint does not plausibly allege antitrust injury. To state a claim under the Sherman Act, "a private plaintiff" must plausibly allege "antitrust injury," which "has been defined as injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007) (internal quotation marks omitted). "Courts have made clear," moreover, "that 'because the antitrust laws are intended to protect competition, and not simply competitors, only injury caused by damage to the competitive process may form the basis of an antitrust claim.'" *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 460 (E.D. Va. 2009) (quoting *Thompson Everett, Inc. v. Nat'l Cable Adver.*, 57 F.3d 1317, 1325 (4th Cir. 1995)).

TraceLink has not plausibly alleged any such harm to competition. In conclusory fashion, TraceLink claims only that HDA's "anticompetitive conduct has already caused . . . a significant increase in the price for DSCSA trace-and-trace compliance solutions" and "has

prevented . . . life sciences companies from obtaining the benefit of competitive compliance services." Compl. ¶ 78; *see also id.* ¶ 87. But no *facts* support these assertions of harm. TraceLink offers no substantiation for its allegations of a price increase, and no indication as to how or why the introduction of a new product somehow leads to fewer choices for potential customers. "To properly allege an antitrust injury," courts have made clear, a plaintiff must plausibly "be able to prove some facts showing a competition-reducing injury as a result of defendants' actions." *Sage Realty Corp. v. ISS Cleaning Servs. Grp., Inc.*, 936 F. Supp. 130, 136 (S.D.N.Y. 1996). And "without accompanying factual allegations that make clear the antitrust injury theory that [a plaintiff] seek[s] to advance," a complaint cannot survive dismissal. *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. 07-01057, 2007 WL 2318906, at *3 n.3 (N.D. Cal. Aug. 13, 2007); *cf. Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 307 (S.D.N.Y. 2004) ("While exactitude is not required, sweeping, conclusory statements cannot suffice as evidence of antitrust injury.").

The only harm the Complaint alleges is harm to TraceLink itself, rather than to the competitive process. A "number of TraceLink's customers," the Complaint alleges, "have discontinued their subscription to TraceLink's Life Sciences Cloud to date, with an unknown number of them switching directly to the HDA's competing solution." Compl. ¶ 54; *see also id.* ¶¶ 79, 90. But again, a negative impact to a company's bottom line does not establish antitrust injury. *See Thompson Everett, Inc.*, 57 F.3d at 1325. In short, TraceLink's claim that the introduction of a competing product "will be detrimental to TraceLink" is entirely unremarkable. Compl. ¶ 55. That is precisely how a competitive market should function, and precisely what "the antitrust laws are intended to protect." *Thompson Everett, Inc.*, 57 F.3d at 1325. Refusing

to recognize this fact, TraceLink instead attempts to wield the Sherman Act as a shield against such competition. That effort should be rejected.

## IV. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE INTERFERENCE WITH TRACELINK'S BUSINESS RELATIONS.

Finally, TraceLink brings two tort claims under Virginia law—one for tortious interference with existing contracts, and another for tortious interference with prospective business relations. *See* Compl. ¶¶ 118-27. According to the Complaint, HDA "intentionally sought to disrupt" both TraceLink's existing "contractual relationship with each business who subscribes to its DSCSA trace-and-trace compliance solution," and its "expectancy of contractual relationship with each business who may choose to [so] subscribe" in the future. *Id.* ¶¶ 119, 120, 124, 125. These claims fail for two reasons. First, TraceLink has failed to identify either the existing or prospective contractual relationships with the specificity required by Virginia law. And second, HDA's alleged conduct constitutes simple competition rather than unlawful interference. Counts 5 and 6 should be dismissed accordingly.

As the Virginia Supreme Court has made clear, "[t]he necessary elements to establish a prima facie case" or tortious interference are:

> (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014). As courts have explained, "these causes of action provide a legal remedy where a particular party's *specific*, *existing* contract or business expectancy or opportunity has been interfered with in a tortious manner." *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003). For this reason, "a party claiming under either of these torts must prove . . . the existence of some

*specific* contract or relationship." *Id.* (emphasis added). "Failure to allege any specific, existing economic interest," therefore, "is fatal to the claim." *Id.*

Furthermore, "the acts or methods used for the interference must themselves be improper." *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378 (Va. 1997). "Methods of interference considered improper," the Virginia Supreme Court has noted, "are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules," as well as "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011) (internal quotations omitted); *see also id* at 871 (noting that "[m]ethods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct," or constitute "[s]harp dealing, overreaching, or unfair competition"). Many actions that cause injury, however, especially in competitive industries are nevertheless not improper—even when "solely motivated by spite, ill will and malice." *Id.* (internal quotations omitted). Judged against these requirements, TraceLink's Complaint fails to allege a plausible claim for relief.

First, TraceLink has not identified any specific contracts or expectancies. Indeed, it points merely to "each business who subscribes" to its product, and "each business who may choose" to do so later. Compl. ¶¶ 119, 124. Such "broad and conclusory" allegations are insufficient "to plead a *specific*, existing contract or expectancy with a *specific* party," *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705-06 (E.D. Va. 2004) (emphasis added), and TraceLink's tortious interference claims should be dismissed accordingly.

Second, even if TraceLink could identify specific contracts or expectancies it has lost, HDA's alleged conduct still would not be actionable because it is not "improper." As set forth above, *see supra* Part I.B, TraceLink's allegations establish only that HDA designed and marketed a product that competed with TraceLink's, but with more basic functionality. TraceLink launches one final attempt to advance its theory that HDA somehow forces its members and their business partners to use Origin exclusively. *See* Compl. ¶¶ 120, 125. Yet once again, this theory is unsupported by any facts, and indeed, is no more plausible as a theory of tort relief. TraceLink's fifth and sixth Counts should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant Healthcare Distribution Alliance respectfully requests that the Court enter an Order dismissing the Complaint with prejudice.


January 3, 2018                                     Respectfully submitted:

                                                    HEALTHCARE DISTRIBUTION ALLIANCE

                                                    By: /s/  *Seth A. Schaeffer*
                                                    Seth A. Schaeffer (VA Bar No. 74509)
                                                    J. Brent Justus (VA Bar No. 45525)
                                                    Casey Erin Lucier (VA Bar No. 80363)
                                                    Nicholas J. Giles (VA Bar No. 86584)
                                                    MCGUIREWOODS LLP
                                                    Gateway Plaza
                                                    800 East Canal Street
                                                    Richmond, Virginia 23219
                                                    Phone: (804) 775-1000
                                                    Fax: (804) 775-1061
                                                    sschaeffer@mcguirewoods.com
                                                    bjustus@mcguirewoods.com
                                                    clucier@mcguirewoods.com
                                                    ngiles@mcguirewoods.com

                                                    *Counsel for Healthcare Distribution Alliance*

## CERTIFICATE OF SERVICE

I certify that on the 3rd day of January, 2018, I electronically re-filed the foregoing with the Clerk of Court using the CM/ECF system, which sends an electronic copy of the foregoing to all counsel of record in this case.

By: /s/   *Seth A. Schaeffer*
Seth A. Schaeffer (VA Bar No. 74509)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Phone: (804) 775-1000
Fax: (804) 775-1061
sschaeffer@mcguirewoods.com