**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
ALEXANDRIA DIVISION

TRACELINK, INC.

                    Plaintiff,

    vs.

HEALTHCARE DISTRIBUTION ALLIANCE,

                Defendant.

Civil Action No. 1:17-1197-AJT-IDD

 

**PLAINTIFF TRACELINK'S OPPOSITION**
**TO HDA'S MOTION TO DISMISS**

January 12, 2018

**CONSTANTINE CANNON LLP**
Matthew L. Cantor (phv)
Harrison McAvoy (phv)
335 Madison Avenue
New York, NY 10017
(212) 350-2700

Seth D. Greenstein (phv)
J. Wyatt Fore (VSB No. 89168)
1001 Pennsylvania Ave., NW
Suite 1300N
Washington, DC 20004
(202) 204-3500

*Counsel for Plaintiff,*
*TraceLink, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 5

    A.    The Distribution Chain for Pharmaceutical Products ............................. 6

    B.    The Development of Track and Trace Products ..................................... 7

    C.    The Conspiracy to Dominate Track and Trace Products Through HDA ............... 7

    D.    The Conspirators' Market Power ......................................................... 10

    E.    The Conspiracy Has Caused Anticompetitive Impact ......................... 10

    F.    HDA has Tortiously Interfered with TraceLink's Business Relationships .......... 12

LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS .................................... 12

ARGUMENT ............................................................................................................ 13

I.    TraceLink's Complaint Alleges Facts that Establish an Unlawful Conspiracy in
Restraint of Trade .............................................................................................. 13

    A.    TraceLink Alleges Direct Evidence of Conspiracy ............................. 13

    B.    TraceLink Alleges Additional Indirect Evidence Sufficient for a Plausible
Inference of Conspiracy ...................................................................... 15

II.    TraceLink's Complaint States a Group Boycott Claim ..................................... 19

III.    TraceLink's Complaint States a Conspiracy to Monopolize Claim ................................. 24

IV.    The Complaint Alleges Facts Demonstrating TraceLink's Antitrust Injury ................... 26

V.    The Complaint States Tortious Interference Claims .......................................... 27

CONCLUSION .......................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Adaptive Power Sol. v. Hughes Missile Sys.*,
141 F.3d 947 (9th Cir. 1998) ..................................................................... 17-18

*Adv. Health-Care Servs., Inc. v. Radford Comm. Hosp.*,
910 F.2d 139 (4th Cir. 1990) ................................................................ 24, 25, 26

*Am. Tobacco Co. v. U.S.*,
328 U.S. 781 (1946) ................................................................................. 14, 24

*Anderson News L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ...................................................................... 13, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 5, 13

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ...................................................................................... 22

*Ballard v. Blue Shield of S. W. Va., Inc.*,
543 F.2d 1075 (4th Cir. 1976) ......................................................................... 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................*passim*

*Beydoun v. Clark Constr. Int'l LLC*,
72 F. App'x 907 (4th Cir. 2003) ...................................................................... 18

*Biovail Corp. Int'l v. Aktiengesellschaft*,
49 F. Supp. 2d 750 (D.N.J. 1999) ..................................................................... 21

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1992) ...................................................................................... 26

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ......................................................................... 18

*Chaves v. Johnson*,
230 Va. 112 (1985) .................................................................................... 27-28

*Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*,
833 F.2d 208 (9th Cir. 1987) .......................................................................... 18

*Cooper v. Forsyth Cty. Hosp. Auth., Inc.*,
    789 F.2d 278 (4th Cir. 1986) ........................................................... 18

*Corbett v. Duerring*,
    780 F. Supp. 2d 486 (S.D.W.Va. 2011) ............................................ 5

*Cont'l Ore v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ...................................................................... 20

*Conwood Co. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ......................................................... 26

*Covad Commc'ns Co. v. Pac. Bell*,
    1999 WL 33757058 (N.D. Cal. Dec. 14, 1999) ................................ 20

*Duggin v. Adams*,
    234 Va. 221, 227 (1987) ................................................................. 28

*E.I. DuPont de Nemours v. Kolon Indus.*,
    637 F.3d 435 (4th Cir. 2011) ................................................. 6, 24, 27

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    720 F.3d 33 (1st Cir. 2013) ............................................................ 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ...................................................................... 23

*Full Draw Prods. v. Easton Sports, Inc.*,
    182 F.3d 745 (10th Cir. 2016) ................................................. *passim*

*Genetic Sys. Corp. v. Abbot Labs*,
    691 F. Supp. 407 (D.D.C. 1988) ..................................................... 18

*Gov. Emps. Ins. Co. v. Google, Inc.*,
    330 F. Supp. 2d 699 (E.D. Va. 2003) .............................................. 29

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
    627 F.2d 919 (9th Cir. 1980) ......................................................... 24

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) ........................................................ 15

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ................................................... 13, 16

*Intellective, Inc. v. Mass. Mut. Life Ins. Co.*,
    190 F. Supp. 2d 600 (S.D.N.Y. 2002) ............................................................ 17, 21

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ............................................................................................. 20

*Lasercomb Am., Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990) .............................................................................. 23

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) ...................................................................... 18

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1992) .............................................................................. 24

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
    354 F. Supp. 2d 293 (S.D.N.Y. 2004) ............................................................... 27

*Malibu Media, LLC v. Guastaferro*,
    2015 WL 4603065 (E.D. Va. July 28, 2015) .................................................... 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................. 18

*Masco Contractor Serv. East, Inc. v. Beals*,
    279 F. Supp. 2d 699 (E.D. Va. 2003) ............................................................... 29

*Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*,
    254 Va. 408 (1997) ............................................................................................. 29

*McWane, Inc. v. F.T.C.*,
    783 F.3d 814 (11th Cir. 2015) ........................................................................... 23

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof. Publ., Inc.*,
    63 F.3d 1540 (10th Cir. 1995) ........................................................................... 23

*Nat'l Elec. Contractors Ass'n Inc. v. Nat'l Constructors Ass'n*,
    678 F.2d 492 (4th Cir. 1982) .............................................................................. 22

*NCAA v. Bd. Of Regents of Univ. of Ok.*,
    468 U.S. 85 (1984) ............................................................................................... 27

*Novell, Inc. v. Microsoft Corp.*,
    505 F.3d 302 (4th Cir. 2007) .............................................................................. 27

*Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*,
  472 U.S. 284 (1985)................................................................ 19

*Osborn v. Visa*,
  797 F.3d 1057 (D.C. Cir. 2015) ........................................... 4, 17

*Palmyra Park Hosp., Inc. v. Phoebe Putney Mem. Hosp.*,
  604 F.3d 1291 (11th Cir. 2010) ............................................... 26

*Precision Rx Compounding, LLC v. Express Scripts Holding Co.*,
  2016 WL 4446801 (E.D. Mo. Aug. 24, 2016) ........................... 15

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*,
  814 F.2d 358 (7th Cir. 1987) .................................................... 23

*Robertson v. Sea Pines Real Estate Cos.*,
  679 F.3d 278 (4th Cir. 2012) ............................................ *passim*

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ..................................................... 5

*Starr v. Sony BMG Music Entm't.*,
  592 F.3d 314 (2d Cir. 2010).................................................... 27

*T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Berman LLC*,
  385 F.3d 836 (4th Cir. 2004) .................................................. 27

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
  57 F.3d 1317 (4th Cir. 1995) .................................................. 27

*U.S. v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)..................................................... 16

*U.S. v. E.I. du Pont Nemours & Co.*,
  351 U.S. 377 (1956)................................................................ 20

*U.S. v. Dentsply Int'l Inc.*,
  399 F.3d 181 (3d Cir. 2005)..................................................... 21

*U.S. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .................................................. 21

*U.S. v. Visa*,
  344 F.3d 229 (2d Cir. 2003).................................... 4, 17, 19, 21

*Williams v. 5300 Columbia Pike Corp.*,
    891 F. Supp. 1169 (E.D. Va. 1995) ................................................................. 24

*Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*,
    331 F. Supp. 2d 513 (E.D. Tex. 2004) ............................................................. 20

## **Federal Rules**

Fed. R. Civ. P. 10(c) & 12(d).................................................................................... 5

Fed. R. Civ. P. 12(b)(6)............................................................................................. 6

Fed. R. Evid. 201(b).................................................................................................. 6

## **Other Authorities**

5 Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure* § 1216 (West 3d ed. 2017)............................... 5

Plaintiff TraceLink, Inc. respectfully submits this memorandum of law in opposition to the motion to dismiss filed by defendant Healthcare Distribution Alliance ("HDA").

## PRELIMINARY STATEMENT

TraceLink's Complaint alleges a textbook case of antitrust conspiracy. It recounts an exclusionary scheme conceived of and effectuated by entities that control over 80% of the wholesale distribution of pharmaceutical products—including, but not limited to, Cardinal Health, McKesson Corporation, and AmerisourceBergen (collectively, the "Big Three"). Compl. ¶¶ 1, 5, 12-17, 74-77. Acting jointly through the "conduit" of HDA—whose "ostensible purpose" is to "act as a trade association" and whose operations are substantially controlled by the Big Three as members of the HDA Board of Directors, Executive Committee, and Traceability Workgroup—these companies have unreasonably restrained trade and conspired to monopolize a separate market for the sale of software that tracks and traces the distribution of pharmaceuticals in accordance with the Drug Chain Supply Security Act ("DSCSA"). *Id.* ¶¶ 1, 2, 5, 12-17, 45-53. Had these entities conspired to monopolize this market without the guise of a trade association, a court would most certainly hold that they violated antitrust law. That they seek to dominate through HDA makes their actions no less unlawful, and makes HDA no less liable as a co-conspirator.

Specifically, the co-conspirators caused HDA, contrary to its purported not-for-profit mission, to venture into the commercial arena by supplying a track and trace product known as "Origin" to "reap monies for HDA and its wholesaler and distributor members." *Id.* ¶¶ 7, 75. From conception to implementation, the HDA conspirators designed Origin to foreclose competition against Origin, including competition from TraceLink, through a series of anticompetitive and wrongful acts. <u>First</u>, HDA developed Origin through a closed and

discriminatory process, departing from its past efforts to collaboratively develop interoperable standards for product compliance with legal regimes, such as the DSCSA, with all relevant industry stakeholders. *Id.* ¶¶ 41-42. Instead, the HDA conspirators developed Origin in secret meetings of HDA's Traceability Workgroup as a non-standard, proprietary solution that is not interoperable with other track and trace platforms. Moreover, members of this Workgroup misappropriated information about TraceLink's product designs and strategies in order to inform the development of Origin; this information was provided to them by TraceLink in confidence. *Id.* ¶¶ 3, 44, 45. The HDA conspirators designed and implemented Origin to be a proprietary, commercial product through stealth tactics and a closed process.

Second, the HDA conspirators made certain that Contributors (e.g., pharmaceutical manufacturers) that own the data and Users (e.g., retailers and health care systems) who need the data to track and trace pharmaceuticals had no choice but to use Origin and pay to play. At a business "conference in early 2017," HDA "urged its wholesaler members to mandate that their business partners use only the Origin product." *Id.* ¶ 49. In turn, HDA "wholesaler distributor members . . . effectively forced customers of wholesaler distributors . . . to use Origin rather than . . . competitive DSCSA track-and-trace compliance solution[s]." *Id.* This mandate to use Origin has compelled Contributors and Users to pay for a technology that they do not want and has made it cost-prohibitive for them to pay for a second track and trace product.

Third, the HDA conspirators forced the entities that must use or contribute data to Origin to execute exclusionary licenses that "require users of competitive track and trace solutions to incur substantial opportunity costs by forcing them to re-enter their data into competitive systems," rather than through electronic, interoperable processes—and, in many cases, "effectively prohibit[s] manufacturers and distributors from dealing with competitors," such as

TraceLink. *Id.* ¶ 50. The Origin User and Contributor Agreements impose several anticompetitive restraints that increase rivals' costs unnecessarily and reinforce and exacerbate the anticompetitive impact of the mandate to use Origin.[1]

HDA's actions have caused and will continue to cause cascading anticompetitive impacts and antitrust injury to TraceLink. *Id.* ¶¶ 6, 77-78. They have foreclosed competition by barring Origin competitors from selling their products, have significantly raised the costs of Origin rivals, and, in turn, have caused competitors to incur "negative network impacts . . . because businesses whose trade partners are unable to use the products of these competitive . . . product suppliers . . . will find these competitive solutions less valuable." *Id.* ¶¶ 64-65. These actions have stifled innovation for these critical products, and has led or will lead to "customers paying supra-competitive prices." *Id.* ¶¶ 6, 77-78. There is no "legitimate business purpose or procompetitive benefit" for these actions. *Id.* ¶¶ 88, 97, 106, 114.

Despite TraceLink's 32-page, 127-paragraph Complaint, detailing the "who, what, where, when, why, and how" of the anticompetitive scheme, HDA now moves to dismiss, claiming that TraceLink's allegations amount to nothing more than legal conclusions that do not meet

---

[1]     HDA asks this Court to take judicial notice of documents that it claims have been the operative Origin agreements, stating that they were incorporated by reference into the Complaint. *See* HDA Mem. at 16 n.3; Exs. A, B. Those exhibits, for which there is no evidentiary foundation, differ, however, from the agreements that TraceLink knew to be in effect when this litigation was launched. *See* Declaration of Matthew L. Cantor, Exs. A-D. Regardless, these purportedly Revised Agreements perpetuate the unlawful exclusionary Origin scheme in effect when the Complaint was filed. They preclude any Contributor or User, and any third party that assists a Contributor or User (such as, in theory, TraceLink), from "directly or indirectly" competing against Origin regardless of whether it uses any element of Origin to compete. HDA Mem. Ex. A § 5(h) and Ex. B § 8(g). Moreover, the new User Agreement prohibits anyone other than distributors or group purchasing organizations from relaying pharmaceutical data to anyone other than the Origin User, thus denying third-party track and trace systems a track and trace capability that is fundamental. HDA Mem. Ex. A § 1(c). And both agreements preclude electronic interoperability between track and trace systems.

3

minimum thresholds of plausibility. Even a cursory read of the Complaint's specific fact allegations and the governing case law, however, demonstrates that HDA's motion is meritless.

Relying on unpublished and inapposite summary judgment authority, HDA principally protests that the conspiracy could not have occurred because it would be illogical for "purchasers" (i.e., wholesaler distributor conspirators) to "reduce competition among sellers" (i.e., track and trace product vendors). HDA Mem. at 1. But the case law "is clear that customers can unlawfully boycott to drive out a producer." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 752 (10th Cir. 2016) (reversing dismissal of complaint). *See Osborn v. Visa,* 797 F.3d 1057 (D.C. Cir. 2015) (vacating dismissal order related to alleged conspiracy by bank buyers of ATM services to foreclose competition in ATM services); *U.S. v. Visa,* 344 F.3d 229 (2d Cir. 2003) (affirming Section 1 judgment related to bank purchaser conspiracy). Further belying HDA's "no buyer conspiracy" argument, the Complaint alleges that the wholesale distributor conspirators are not merely buyers; *they are sellers too. See Robertson v. Sea Pines Real Estate Cos.,* 679 F.3d 278 (4th Cir. 2012) (reversal of dismissal order where broker buyers of MLS services use their control of offering MLS services to harm competition). Through the façade of the HDA, they developed Origin—"competing for business" in track and trace product sales—to reap financial and data control benefits that offset any hypothetical harm that they might incur as buyers. HDA Mem. at 3.

HDA's other contentions are equally unavailing. This is not a case, as HDA asserts, where "some customers have chosen to use Origin." HDA Mem. at 1. The Complaint alleges that the HDA conspirators *mandated* use of Origin under unduly restrictive licenses, thereby forcing the market to forego competing and superior track and trace solutions. Nor does the Complaint allege that "mere membership in a trade association" gives rise to the conspiracy.

HDA Mem. at 19. These conspiring members were not "mere members"; they wield market power over distribution of pharmaceutical products and control HDA's operations—thereby leveraging HDA to attain market power over the parallel track and trace solutions market. Moreover, contrary to HDA's assertion, the Complaint easily satisfies antitrust injury standards, as TraceLink's allegations show that its injury flows from competitive harm caused by HDA.

Finally, in addition to stating valid antitrust claims, the Complaint articulates claims for tortious interference. The Complaint alleges that the HDA conspirators knew of TraceLink's confidential plans to develop a track and trace product by attending briefings with TraceLink customers, and then leaked these confidential plans to the HDA committee that designed Origin. Compl. ¶ 3. These allegations show that HDA knew who TraceLink's actual and prospective customers were, and that HDA used improper means to interfere with TraceLink's relationships.

HDA's motion to dismiss should be denied.

## STATEMENT OF FACTS

TraceLink alleges the following facts in its Complaint, all of which should be assumed to be true and should be construed in the light most favorable to TraceLink.[2] *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (citation omitted).[3] TraceLink is "not require[d]. . . to prove [its] claim in the complaint." *Robertson,* 679 F.3d at 291.

---

[2]      The presumption of truth should be afforded to all allegations except those that baldly assert an element of a cause of action (e.g., that defendant has caused an anticompetitive impact). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (the "tenet that a court must accept as true all of the allegations . . . is inapplicable [only] to legal conclusions"); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1216 (West 3d ed. 2017) (equating "conclusory" allegations with "formulaic recitation of the elements"); *Corbett v. Duerring*, 780 F. Supp. 2d 486, 491 (S.D.W.Va. 2011) (same). None of the allegations set forth below do that: they specifically identify how and why the HDA conspirators violated the law.

[3]      In assessing a 12(b)(6) motion, a court may not look beyond the four corners of the Complaint, but may consider documents incorporated by reference therein. *See* Fed. R. Civ. P. 10(c) & 12(d). HDA contends that the Origin User and Contributor Agreements that it appends

## A. The Distribution Chain for Pharmaceutical Products

Today, most people can rapidly fill prescriptions through a pharmacy in nearly every neighborhood in the U.S.  Compl. ¶ 23.  The ease with which people can obtain their prescription drugs "requires an entire supply chain capable of delivering the correct drugs in the correct dosages from manufacturers to local dispensers."  *Id.*  This supply chain includes "manufacturers who produce the drugs, wholesaler distributors who distribute the drugs, as well as dispensers, repackagers, and logistics providers."  *Id.*

Wholesaler distributors act as "the middle men between manufacturers and dispensers."  *Id.* ¶ 25.  They "purchase and obtain drugs from the manufacturers, store the drugs . . . , and then sell and deliver the desired quantities to the individual dispenser."  *Id.*

Three companies dominate wholesale distribution of pharmaceuticals in the U.S.: AmerisourceBergen, Cardinal Health, and McKesson.  *Id.* ¶¶ 14-16.  The "Big Three" collectively wield a share of more than 80% of the wholesale distribution market.  *Id.* ¶ 76.

Crucially, the Big Three distributors dominate and substantially control HDA.  *Id.* ¶¶ 5, 13.  Big Three executives sit, *inter alia*, on HDA's Board of Directors; its Executive Committee; and, as particularly germane to the allegations of the Complaint, HDA's Traceability Workgroup.  *Id.* ¶¶ 5, 13, 45, 75.

---

to its brief can be so incorporated into the Complaint or subject to judicial notice.  The User and Contributor Agreements in force at the Complaint's filing, and particularly the User Agreement, had different terms, as discussed in the Cantor Declaration.  As an evidentiary foundation would be needed to recognize these documents, and a dispute exists as to which documents have been in force during the pendency of the conduct alleged in the Complaint, it is not appropriate to hold that these documents were incorporated into the Complaint or take judicial notice under Fed. R. Civ. P. 12(b)(6) or Fed. R. Evid. 201(b).  *See E.I. DuPont de Nemours v. Kolon Indus.*, 637 F.3d 435, 449 (4th Cir. 2011) (finding district court improperly dismissed complaint based in part on consideration and judicial notice of disputed matters).  In any event, as set forth below, these agreements—even as purportedly modified—continue to exclude competition, raise rivals' costs, and reinforce and exacerbate the anticompetitive impact of the HDA conspiracy.

## B. The Development of Track and Trace Products

In response to the threat from counterfeit and adulterated drugs, Congress enacted the DSCSA "to facilitate the tracing of prescription drug products through the pharmaceutical distribution supply chain." *Id.* ¶ 27. The DSCSA "outlines steps to build an electronic, interoperable system to identify and follow ('track and trace') drugs these from manufacturer to dispenser." *Id.*[4]

## C. The Conspiracy to Dominate Track and Trace Products Through HDA

HDA's ostensible mission is "to influence standards and business processes that produce efficient health care commerce." *Id.* ¶ 11. HDA's "not for profit" mission does not include acting as a "commercial supplier" of software products to earn revenue. *Id.* Contrary to its purported not-for-profit mission, HDA has ventured into the commercial arena by supplying Origin and charging fees to both track and trace data Contributors and data Users that interconnect with it. *See* HDA Mem. Exs. A & B at Schedule 1 ("Terms and Payment").

HDA "serve[d] as the conspiratorial conduit for the collective actions of its members, who conspire[d] through meetings held through the HDA and otherwise." Compl. ¶ 75. As a result, HDA created Origin, not as a stand-alone entity, but in order "to reap monies for itself and its wholesaler distributor members," particularly the Big Three. *Id.* ¶¶ 7, 41, 44 (the conspiracy to create and market Origin was made by "HDA, and its largest members" by way of, *inter alia,*

---

[4]     Congress intended this new system to be "interoperable," so that trading partners can use multiple technologies and software to exchange standardized information about the pharmaceutical drugs they trade. To create an interoperable system, each product must have a unique identifier (a "serial") whose meaning is defined by open standards. Under this system, a commercial purchaser of pharmaceutical product compares serialization information on the outside of the box to information supplied through track and trace software. *Id.* ¶¶ 30, 34. If the product's serialization information matches information in the track and trace database, the recipient knows that the product met DSCSA requirements for product integrity. *Id.*

"the collective efforts of those entities that sat on the Traceability Workgroup"); *id.* ¶ 75 (HDA

engaged in these acts "at the initiative of, and to primarily advance strategies defined by, the Big

Three," as they "will benefit from the financial and other rewards" resulting from Origin).  HDA

"chose, collectively with and on behalf of its members, to supply and market its own"

compliance solution.  *Id.* ¶¶ 3, 11, 44.

In the past, HDA coordinated open standards efforts that allowed "a degree of

competition among technology providers to develop products that met" certain "standard

policies, processes or methods of data exchange."  *Id.* ¶ 41.  An example of this open HDA-

sponsored process occurred in 2014, when "the Traceability Workgroup developed what became

the" EDI Guidelines.  *Id.* ¶ 42.[5]

In contrast to this previous open and voluntary process, "HDA, with the assistance of its

Traceability Workgroup, adopted a wholly closed and exclusionary process to develop the Origin

product."  *Id.* ¶ 44.  HDA developed "in secret" a Request for Proposal (the "RFP") "for the

creation of a data repository and exchange product that eventually became known as Origin."  *Id.*

HDA did not "broadly solicit responses from all potential companies qualified to develop and

manage the product . . . ."  *Id.* ¶ 44.  Instead, "HDA, and its largest members, made the collective

decision to exclude TraceLink from this process."  *Id.*  The purpose of this RFP thus was not to

"create an open product for data exchange and a commonly available repository that could be

---

[5]      The EDI Guidelines are a widely-adopted "set of electronic data interchange standards to
support the exchange of information for, among other things, purchase orders and delivery
notices."  Compl. ¶ 42.  To develop the EDI Guidelines, the "Traceability Workgroup drafted an
initial set, . . . [and] circulated [them] to the entire HDA . . .  membership for feedback and
revision," which HDA revised before publication in "response to concerns [that were] raised."
*Id.*

utilized by all service providers," but rather to "develop[] Origin as a *proprietary* solution that HDA would supply and market." *Id.* ¶ 46.

HDA developed and issued the secret RFP for Origin "after certain of its members, in a confidential TraceLink briefing, learned that TraceLink planned to supply a track and trace product that would assist companies . . . to comply with DSCSA regulations" and which bore "certain similarities to Origin." *Id.* ¶¶ 3, 45. After issuing the RFP to only a limited number of pre-selected companies, "members of the HDA Traceability Workgroup, including the Big Three, selected ValueCentric, LLC as HDA's vendor to develop Origin." *Id.* ¶ 46.

Before releasing Origin, HDA "urged its wholesaler distributor members to mandate that their business partners use only the Origin product." *Id.* ¶ 49. HDA made "this request at least once, at a conference in early 2017." *Id.* The HDA wholesaler distributor members "have, in turn, mandated that their business partners use the Origin product in their dealings," which "effectively forced customers of wholesaler distributor members with substantial market power, like the Big Three, to use Origin rather than TraceLink . . . ." *Id.*

HDA enforces effective exclusivity for Origin by compelling Users and Contributors to "accept sweeping, restrictive non-compete clauses as a condition of using the Origin database." *Id.* ¶ 50. First, HDA precludes Users from building or permitting to be built "a product or service competitive with the Origin HDA Product Data Source Service," including by making data from Origin available to others. Cantor Decl. Ex. A § 5(d)-(e), (h); HDA Mem. Ex. A § 5(d)-(e), (h). Second, HDA forces Users to agree that "HDA is [the] owner of the database *and the data therein*"—even though Contributors, not HDA, own that Data.[6] HDA Mem. Ex. A § 1

---

[6]     *See* HDA Mem. Ex. B § 1 ("Contributor . . . covenants during the Term, that: (a) it [i.e., Contributor] is the owner of and has the right to upload the specific GTIN Records related to products for which it has responsibility").

(emphasis added); *id.* § 5(b)-(c), (h) (precluding Users and their "Authorized Users" from copying, adding to, or changing the data). Third, the User Agreement restricts access to and use of the data only for a User's "internal" business, and precludes that Authorized User from further relaying that data to a User's customers, reducing substantially the value of that data. *Id.* § 1. As a result, these clauses substantially raise the cost for Contributors and Users to deal with Origin competitors, such as TraceLink, and threaten such competitors with liability from using information that HDA concedes it does not create or own. Compl. ¶ 50.

### D.    The Conspirators' Market Power

Two product markets are relevant to this case: the market for track and trace compliance products and the market for wholesale distribution of life sciences products. *Id.* ¶¶ 61-66, 67-70. HDA and its co-conspirators collectively wield market power in the wholesale distribution market; the Big Three alone account for 80% of the sales in that product market. *Id.* ¶ 76.

The HDA conspirators also wield power in the market for track and trace compliance solutions, as evidenced by their "ability to exclude" competition. *Id.* ¶ 74. The HDA conspirators have, indeed, already excluded competition in the market for track and trace compliance solutions by, among other things, forcing suppliers to contribute data to Origin and forcing their customers to use Origin, rather than other track and trace compliance products. *Id.* ¶¶ 4-5, 46, 49-50. Accordingly, HDA's market power in the market for track and trace compliance products "emanates from the market power that its members, particularly the Big Three, wield in the wholesale distribution market."

### E.    The Conspiracy Has Caused Anticompetitive Impact.

HDA's anticompetitive conduct "has harmed and will continue to harm competition in the DSCSA track-and-trace compliance solutions market." *Id.* ¶ 78. More specifically, HDA has

harmed competition by foreclosing competition, "significantly reducing the quality of compliance services on which companies can rely," and stunting innovation. *Id.* ¶¶ 6, 78. HDA's conduct has forced TraceLink's subscribers "to transfer their business for certain track and trace master data solutions to . . . Origin"—a product with less utility than, for example, TraceLink's. *Id.* ¶ 79. These actions have "already caused, and likely will cause, a significant increase in the price for DSCSA track-and-trace compliance solutions," and will deprive companies "from obtaining the benefit of competitive compliance services." *Id.* ¶ 78.

This harm to competition is particularly pronounced because the market for track and trace compliance solutions is "characterized by substantial network effects." *Id.* ¶ 64. A "particular compliance solution becomes more valuable to life science supply chain businesses as more of its business partners use that product." *Id.* By "mandating the use of Origin and prohibiting the extraction of data from Origin into competing compliance solutions, the HDA and its co-conspirators caused competitive track and trace product suppliers, such as TraceLink, to incur significant negative network impacts." *Id.* "This occurs because businesses whose trade partners are unable to use the products of these competitive track and trace product suppliers (due to HDA's anticompetitive acts . . . ) will find these competitive solutions less valuable." *Id.*

TraceLink "has suffered and will continue to suffer injury as a direct" and "proximate result of the HDA's" "conspiratorial actions," "exclusionary conduct," and "acts of monopolization." *Id.* ¶¶ 90, 98, 107, 115. TraceLink "has been forced to discontinue certain product sales to a substantial portion of its customer base due to" HDA's anticompetitive conduct. *Id.* ¶ 115. If "HDA continues its illegal conduct as it has threatened, then TraceLink will likely lose the ability to market its competing" product, as "the network effects of the Origin non-compete clauses will make using TraceLink's product unviable." *Id.* ¶ 54.

There is "no legitimate business purpose or procompetitive benefit that offsets the anticompetitive impacts caused by the scheme engaged in by the HDA and its members." *Id.* ¶ 7; *see also id.* ¶¶ 88-89, 97, 106, 114.

### F.    HDA has Tortiously Interfered with TraceLink's Business Relationships.

HDA "has tortiously interfered with TraceLink's contractual relationships" and "prospective relationships." *Id.* ¶ 80-81.  Before creating Origin, HDA knew who TraceLink's customers were, as several members of its Traceability Workgroup attended a confidential briefing by TraceLink to TraceLink customers about its product strategies—strategies that identified that TraceLink planned to develop and offer a product with certain similarities to Origin.  *Id.* ¶ 45.  HDA then used these product strategies to inform the development of Origin. *Id.*  HDA "intentionally interfere[d] with" these current and prospective business relations, and "TraceLink has suffered damage as a result" of the HDA's actions.  *Id.* ¶¶ 80-81.

### LEGAL STANDARDS APPLICABLE TO A MOTION TO DISMISS

Rule 8 provides that a complaint seeking relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Contrary to HDA's suggestion, antitrust complaints are not held to any heightened pleading standard: "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 n.3 (1st Cir. 2013) (reversing dismissal and holding that *Twombly* "rejected a heightened pleading standard in antitrust cases, despite acknowledging that discovery in antitrust cases 'can be expensive.'")

Accordingly, a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely."  *SD3,*

801 F.3d at 418 (quoting *Twombly*, 550 U.S. at 556); *Robertson*, 679 F.3d at 284; *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (Posner, J.) (plausibility "need not be as great as such terms as 'preponderance of the evidence' connote"). *See also Anderson News L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (reversing dismissal and noting that "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action," as required at summary judgment stage). *Twombly* merely holds that a complaint must contain—as here—non-conclusory allegations of fact that, if true, would demonstrate that an antitrust violation occurred. *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678.

## ARGUMENT

The Complaint far surpasses minimal pleading standards. It references specific facts showing direct *and* indirect evidence of the illegal conspiratorial agreement; the attempt to use Origin to monopolize the market for track and trace pharmaceutical products; and improper interference with TraceLink's existing contracts and prospective business opportunities. Contrary to HDA's repeated contention otherwise, the Complaint offers much more than mere recitations of the elements of TraceLink's antitrust and common law tort claims.

**I.     TraceLink's Complaint Alleges Facts that Establish an Unlawful Conspiracy in Restraint of Trade.**

**A.     TraceLink Alleges Direct Evidence of Conspiracy.**

In the Fourth Circuit, a complaint's allegations of direct evidence of conspiracy are sufficient to meet *Twombly*'s plausibility requirement. *See Robertson,* 679 F.3d at 289 (affirming denial of motion to dismiss based on direct evidence of conspiracy). Where—as here—there "is no such uncertainty . . . about the terms of the agreement, let alone whether one was made," then "*Twombly*'s requirements with respect to . . . parallel conduct are inapplicable"

because "the concerted conduct is not a matter of inference or dispute." *Id.* at 289-90. *See also Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 809-10 (1946) ("The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words.").

TraceLink's Complaint alleges direct evidence of a conspiracy substantially the same as the allegations upheld by the Fourth Circuit, on motion to dismiss, in *Robertson*. There, the Fourth Circuit found sufficient allegations of conspiracy where real estate brokerages used a Multiple Listing Service that they controlled through board memberships "as a conduit" to "inhibit competition." 679 F.3d at 283 (internal citations omitted). Here, the Complaint similarly alleges that "HDA is dominated by the Big Three, which substantially control its operations" and that HDA served as a "conduit" for the conspirators' discussions. Compl. ¶¶ 1, 13. It further states that HDA (a) entered into the commercial arena on behalf of its membership, contrary to its purported mission and its "not for profit" status, to supply a track and trace product in competition with that supplied by TraceLink and others; (b) used confidential information misappropriated from TraceLink, and employed a secret, closed, and discriminatory process for selecting a vendor to craft that track and trace product; (c) exhorted its members to mandate use of Origin; and (d) imposed exclusionary licenses upon those that are forced to use Origin. *See supra* Statement of Facts Parts C, E.

This direct evidence shows that HDA is both the glue that binds the conspirators together and the means they used to harm competition. No analysis to infer a conspiracy from circumstantial evidence is necessary to demonstrate the plausibility of this conspiracy. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010) (reversing grant of motion to dismiss because, among other things, plaintiffs' conspiracy allegations identified joint ventures

through which competitors conspired).  *See also Precision Rx Compounding, LLC v. Express Scripts Holding Co.*, 2016 WL 4446801 (E.D. Mo. Aug. 24, 2016) (denying motion to dismiss where control of industry group indicated plausible allegation of conspiracy).  On this basis alone, HDA's motion should be denied.

### B. TraceLink Alleges Additional Indirect Evidence Sufficient for a Plausible Inference of Conspiracy.

Regardless, the complaint also alleges bountiful indirect evidence of the conspiracy.  A complaint may allege a plausible conspiracy when the plaintiff pleads "parallel conduct *and* something 'more' . . . . [which] consist[s] of 'further circumstance[s] pointing toward a meeting of the minds.'"  *SD3*, 801 F.3d at 424 (quoting *Twombly*, 550 U.S. at 557)); *see Anderson News*, 680 F.3d at 183 ("conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision") (citation omitted).  *See also Robertson*, 679 F.3d at 289-90.  A plaintiff can plead the "more" by alleging facts about the "who, what, when, and where" the conspiracy took place, as well as the "why."  *SD3*, 801 F.3d at 431; *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069-70 (8th Cir. 2017) (reversing dismissal and noting that the complaint lists "relevant individuals, acts, and conversations" showing plausibility), *cert. denied* 2018 WL 311347 (Jan. 8, 2017).

When evaluating circumstantial evidence of conspiracy at the pleadings stage, the Fourth Circuit cautions that a plaintiff does *not* need to "summon evidence tending to exclude the possibility of independent action."  *See SD3*, 801 F.3d at 425-26 (reversing dismissal of group boycott claim and holding that the district court "confused the motion-to-dismiss standard with the standard for summary judgment").  Such an inquiry confuses "probability and plausibility" by "weighing the competing inferences that can be drawn from the complaint."  *Id.* at 425.

*In re Text Messaging Antitrust Litigation* expounds upon how a court should evaluate circumstantial evidence of a conspiracy at the pleading stage. There, the Seventh Circuit (Posner, J.) affirmed the denial of a motion to dismiss. The *Text Messaging* plaintiffs, like TraceLink, alleged more than mere parallel conduct by competitors. Rather, they alleged specific facts—plus factors—demonstrating a "non-negligible probability that the claim [was] valid." 630 F.3d at 629. For example, they identified a concentrated industry structure; so does TraceLink. *See, e.g.*, Compl. ¶ 76 ("The collective share of the Big Three alone in [the wholesale distribution market] exceeds 80%."). The *Text Messaging* plaintiffs also pointed to industry practices that "facilitate" conspiratorial action, just as the detailed allegations in TraceLink's Complaint identify that the Big Three (a) controlled the operations of the HDA and, thereby, used the HDA as a conduit to conspire and (b) were members of the HDA Traceability Workgroup that stole HDA confidential information to craft Origin and orchestrated the closed RFP process that HDA used to select a vendor to build Origin. *See, e.g.*, *id.* ¶¶ 43-46, 75. And the *Text Messaging* plaintiffs identified that the defendants engaged in "complex and historically unprecedented" acts, just as TraceLink's Complaint alleges that supply of a commercial product by HDA was contrary to its ostensible and historic "not for profit" mission. Such unprecedented acts "support a plausible inference of conspiracy." *Text Messaging*, 630 F.3d at 627-28 (quoting *Twombly*, 550 U.S. at 557 n.4); *see* Compl. ¶¶ 42-43; *see also U.S. v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (inferring conspiracy in part from "complex and historically unprecedented changes . . . made for no other discernible reason") (citation omitted). Here, like in *Text Messaging,* the Complaint alleges much more than just parallel conduct—it also identifies "plus factors," including the "why." *See, e.g., supra* Statement of Facts Part C (identifying allegations that distributors mandated use of Origin and Origin agreements).

HDA, nonetheless, erroneously argues that "no plausible explanation . . . can" be made "as to why HDA's members—who are customers of DSCSA compliance software—would conspire to *reduce* competition in that market." HDA Mem. at 2. That proposition contravenes substantial case law. Courts long have recognized that buyers can conspire to reduce competition in a product they purchase. *See Osborn*, 797 F.3d 1057 (reversing dismissal where plaintiffs alleged that banks purchasers of ATM services conspired to fix elements of ATM card access through bankcard association rules); *Full Draw*, 182 F.3d at 752 (reversing dismissal and noting "it is clear that customers can unlawfully boycott to drive out a producer"); *Visa*, 344 F.3d 229 (affirming Section 1 judgment).

Here, the Complaint articulates why the HDA distributors embarked on their illegal scheme. They did so because, in addition to being buyers of track and trace products, they sell those products via their captured trade association—the HDA. *See supra* Statement of Facts Part C. *See also Robertson*, 679 F.3d at 289 (allegations that real estate brokerage purchasers of MLS services that controlled sale of MLS services had conspired deemed sufficient); *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 615 (S.D.N.Y. 2002) (denying motion to dismiss where "purchasers" of service conspired to supply it to third parties). The HDA conspirators will receive substantial benefits from foreclosing competition by "reap[ing] monies" from purchasers of DSCSA compliance solutions, potentially at "supra-competitive prices." Compl. ¶¶ 6-7. The Big Three will also benefit from controlling extensive data about pharmaceutical product flow through the supply chain. *See supra* Statement of Facts Part C.

HDA cites several cases for the proposition that courts "have routinely . . . rejected" buyer conspiracy "allegations as implausible." HDA Mem. at 10. Those cases are inapposite. They are virtually all summary judgment, unpublished, or discredited authorities. *See Adaptive*

*Power Sol. v. Hughes Missile Sys.*, 141 F.3d 947 (9th Cir. 1998) (summary judgment); *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208 (9th Cir. 1987) (same); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986) (same); *Cooper v. Forsyth Cty. Hosp. Auth., Inc.*, 789 F.2d 278 (4th Cir. 1986) (same); *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275 (4th Cir. 2012) (unpublished), *reasoning rejected by SD3,* 801 F.3d at 422; *Beydoun v. Clark Constr. Int'l LLC*, 72 F. App'x 907 (4th Cir. 2003) (unpublished); *cf.* 4th Cir. R. 32.1 (citation of unpublished opinions issued before January 1, 2007 "in the district courts within this Circuit is disfavored . . . .").

HDA's cited decisions are also distinguishable.  In *Genetic Sys. Corp. v. Abbot Labs*, 691 F. Supp. 407 (D.D.C. 1988), plaintiff alleged a purely *vertical* conspiracy that Red Cross, a purchaser of blood testing equipment, conspired with a supplier.  In contrast, TraceLink's Complaint alleges that wholesaler distributors conspired horizontally *through* HDA to develop and market Origin.  *See* Compl. ¶ 75.  Similarly, in *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984), plaintiffs also alleged a *vertical* conspiracy, and the court noted that the "fatal flaw in these pleadings is the absence of any allegation, either direct or inferential, of an anticompetitive effect."  *Id.* at 1109.  In contrast, the present Complaint explains in detail numerous anticompetitive effects of HDA's actions, accomplished through a horizontal conspiracy.  *See* Compl. ¶¶ 6, 86, 96, 104, 112.  Similarly, the plaintiffs in *Forsyth County*, made *no* allegations that the co-conspirators controlled the association through which the alleged conspiracy occurred.  789 F.2d 278 (summary judgment).  TraceLink's Complaint explicitly states "HDA is dominated by the Big Three."  Compl. ¶ 13.

TraceLink's Complaint alleges the "parallel conduct" and "further circumstance pointing toward a meeting of the minds" to infer a plausible conspiracy.  *Twombly*, 550 U.S. at 557.

**II.    TraceLink's Complaint States a Group Boycott Claim.**

TraceLink's Complaint alleges that HDA's conduct constitutes an unreasonable restraint of trade under federal and state antitrust law.  One form of unreasonable trade restraint is a group boycott, which is a horizontal agreement among competitors to disadvantage another firm or firms, such as by coercing business partners to deny relationships with others.  *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294 (1985).  A group boycott is a *per se* violation of antitrust law where the boycotters collectively wield "market power" because, in such situations, it is "likely" that the boycott has "predominantly anticompetitive effects."  *Id.* at 298.  "In these cases, the boycott often cut[s] off access to a supply, facility, or market necessary to enable the boycotted firm to compete . . . ."  *Id.* at 294; *SD3*, 801 F.3d at 433 (identifying *per se* group boycott as agreement among "group of competitors" to "inhibit the competitive vitality of rivals"); *see also Ballard v. Blue Shield of S. W. Va., Inc.*, 543 F.2d 1075, 1078 (4th Cir. 1976) (reversing dismissal of group boycott claim based on refusal to provide insurance coverage and resulting foreclosure of access to market for chiropractic services).  *See also Visa*, 344 F.3d at 238-43 (enjoining payment networks owned by bank purchasers from cutting off bank distribution for alternative networks).

Here, the Complaint states a valid claim for unreasonable restraint of trade under a group boycott theory.  The HDA conspirators wield substantial market power, inasmuch as they collectively dominate the distribution market.  Compl. ¶ 76; *see Visa,* 344 F.3d at 239 ("[M]arket power may be presumed if the defendant controls a large enough share of the relevant market.").  The market power of the HDA conspirators is also supported by the allegation that the HDA conspiracy has excluded track and trace competitors.  Compl. ¶¶ 74-76.  *See id.* at 239 ("Market power has been defined by the Supreme Court to mean 'the power to control prices *or* exclude

competition.'" (citing *U.S. v. E.I. du Pont Nemours & Co.*, 351 U.S. 377, 391 (1956); *NCAA v. Bd. of Regents of Univ. of Ok.*, 468 U.S. 85, 109 n.38 (1984) (emphasis added))).

The conspirators, through the conduit of HDA, engaged in a horizontal agreement to mandate its business partners' use of Origin which, in turn, precluded entities in the pharmaceutical industry from purchasing TraceLink's track and trace compliance product. *See supra* Statement of Facts Part C. Courts have roundly condemned horizontal arrangements, such as these, that mandate the use of one product over another. *See Full Draw Prods.*, 182 F.3d at 750-51 (reversing dismissal of group boycott claim where members of trade organization agreed to attend trade organization's trade show and boycott plaintiff's trade show).

Distributors' mandates to use Origin substantially foreclose competition, deter new entrants, and curtail innovation in the relevant market, which are outcomes detrimental to competition. Compl. ¶¶ 6, 48, 51; *see SD3*, 801 F.3d at 426. There is no procompetitive justification or offsetting procompetitive benefit for such a horizontal agreement among competitors that collectively wield market power. Compl. ¶ 7; *see Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959) (recognizing "[g]roup boycotts . . . have long been held to be in the forbidden category" of anticompetitive restraints).

Furthermore, HDA uses restrictive licensing provisions to raise rivals' costs and prohibit interoperability. These provisions further restrain competition for track and trace products and provide additional evidence of anticompetitive conduct supporting TraceLink's claims.[7] The

---

[7] The impacts caused by the mandate to use Origin and the exclusionary licenses should be adjudged together and not in piecemeal fashion. *Cont'l Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 535 (E.D. Tex. 2004) (following *Continental Ore* and denying motion to dismiss); *Covad Commc'ns Co. v. Pac. Bell*, 1999 WL 33757058, at *11 (N.D. Cal. Dec. 14, 1999) (refusing to dismiss complaint based on "various

imposition of these restrictive agreements on pharmaceutical manufacturers, distributors, and retailers constitutes antitrust violations, as they prevent competitive track and trace product vendors, pursuant to the HDA conspirators' mandates, from accessing or using the Origin data that are necessary for competition. *See Intellective*, 190 F. Supp. 2d at 616 (denying motion to dismiss group boycott claim alleging horizontal agreement among insurance companies to control use of data and thus preventing competing product).[8]

HDA's description of Origin's User and Contributor Agreements belies their true anticompetitive effect. Origin's User Agreement constrains the use of the data input into Origin and limits the ability of track and trace competitors to provide services. The Origin agreements in effect at the time the Complaint was filed flatly prohibited competitors from providing any services to Users or Contributors. Cantor Decl. Ex. A § 5; Ex. B § 8. Regardless, even under the purported and newly modified Origin agreements, fundamental prohibitions persist, which:

- Bar the signatory and its "subcontractors, independent contractors and agents" from "build[ing] or permit[ting] to be built a product or service competitive to the Origin HDA Product Data Source Service," without regard to whether such competitive service uses any data from the Origin database or elements of the Origin system. HDA Mem. Ex. A § 5(h) and Ex. B § 8(g). This prohibition alone is anticompetitive on its face and precludes competitors from accessing Origin, contrary to HDA's assertion. Def. Mem. at

forms of anti-competitive conduct" despite fact that allegations for "price squeez[ing] standing alone . . . would not equal exclusionary practices"); *Biovail Corp. Int'l v. Aktiengesellschaft*, 49 F. Supp. 2d 750, 760 (D.N.J. 1999) (denying motion to dismiss).

[8] Antitrust violations will result even where the restraints in question only partially foreclose competition. *U.S. v. Dentsply Int'l Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001) (boycott claim need not "bar its rivals from all means of distribution" if it "bar[s] them from the cost-efficient ones"); *Visa*, 344 F.3d at 242 (affirming Section 1 judgment even where excluded competitors were not wholly barred from distributing their payment cards).

17.  *See Microsoft*, 253 F.3d at 60-62 (finding licenses that deter promotion and usage of rival browser software to be anticompetitive).

- Bar Contributors from using a competing service provider to input GTIN data into Origin, copy the data, or share the data with a Contributor's business partners.  HDA Mem. Ex. B § 3.

- Require Origin Contributors that want to use competing products to track pharmaceuticals downstream to their customers to conform data pulled from Origin to an interoperable format, and then send it on to the competing service provider.

- Bar competing service providers that access Origin on behalf of a User from sending data from Origin to a *User's customer or business partner*, substantially reducing the utility of having a track and trace competitor access Origin on behalf of a User in the first place, and effectively restricting the track and trace functionality of Origin to distributors like the Big Three.  HDA Mem. Ex. A § 1(a), (c).

In sum, the Origin agreements restrict competition from third parties by barring competitors from dealing with Contributors and Users or otherwise forcing competitors to incur substantial costs that would not exist but for these restrictive licenses—costs that will either make competing products unattractive or be passed on by the Contributor or User to the competing service provider.  Courts have routinely condemned conduct resulting in increased cost to rivals as anticompetitive.  *See, e.g.*, *Nat'l Elec. Contractors Ass'n Inc. v. Nat'l Constructors Ass'n*, 678 F.2d 492, 497, 501 (4th Cir. 1982) (holding that rule imposing additional charge on non-union electricians raised rivals "cost of doing business" and was anticompetitive); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604 n.31 (1985) (quoting R. Bork, *The Antitrust Paradox* 156 (1978)) (affirming antitrust judgment for

competitor plaintiff and holding that "[b]y disturbing optimal distribution patterns one rival can . . . force the other to accept higher costs"); *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832, 838 (11th Cir. 2015) (holding that exclusive dealing arrangements that raise rivals' costs are anticompetitive); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof. Publ., Inc.*, 63 F.3d 1540, 1553 n.12 (10th Cir. 1995) (reversing summary judgment); *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 368 (7th Cir. 1987) (trade association's rule that "increase[d] its rivals' costs of doing business" was anticompetitive).

HDA's attempt to evade antitrust scrutiny by painting the data restrictions in Origin's User and Contributor Agreements as mere "standard intellectual property protection clause[s]" also fails. HDA Mem. at 17. First of all, such defenses cannot be considered on this motion, as they are disputed and unproven assertions outside the Complaint. *See* Compl. ¶ 7. Even if it were proper to consider such a defense now, HDA admits Origin's underlying data is not protectable, instead positing that the data restrictions apply only to the compilation of the data. HDA Mem. at 16-17 ("HDA's intellectual property extends only to the 'selection and arrangement' of the data within Origin . . . .") (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991)).[9] Since TraceLink and other competitors would only use the unprotectable data, HDA concedes no "intellectual property" right pertains. And, in any event, based on HDA's own cited authority, it is unlikely that the Origin database (a compilation of numerical data and associated manufacturer names) is protectable at all, making the anticompetitive

---

[9]     HDA's attempt to claim ownership rights over data that it does not own, *see* HDA Mem. Ex. B § 1, constitutes misuse, further supporting TraceLink's antitrust claims and defeating HDA's purported "intellectual property" justification. *See Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 972-79 (4th Cir. 1990) (finding misuse defense applies against license agreement that "attempts to suppress any attempt by the licensee to independently implement the idea which [the licensed software] expresses"); *see also Malibu Media, LLC v. Guastaferro*, 2015 WL 4603065 (E.D. Va. July 28, 2015) (denying motion to strike misuse defense).

purpose of the data restrictions all the more apparent.  *See Feist*, 499 U.S. at 362 (rejecting copyright claim based on wholesale copying of names, addresses, and numbers in phone book).

Finally, HDA cannot argue that TraceLink somehow benefits from Origin's restraints on competition.  HDA Mem. at 18.   The Complaint makes clear that TraceLink incurred antitrust injury flowing from the harm to competition caused by the HDA conspiracy.  *See infra* part III; *Full Draw*, 182 F.3d at 751-55 (antitrust injury sufficiently pleaded in case concerning purchasers that allegedly conspired through a trade organization).

## III.     TraceLink's Complaint States a Conspiracy to Monopolize Claim.

TraceLink's Complaint also states a valid claim for conspiracy to monopolize the market for track and trace compliance solutions.  "In order to state a claim for conspiracy to monopolize, a plaintiff must show concerted action, a specific intent to achieve an unlawful monopoly, and commission of an overt act in furtherance of the conspiracy."  *Adv. Health-Care Servs., Inc. v. Radford Comm. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990).  "[S]pecific intent may be inferred from the defendants' anticompetitive practices."  *E.I. du Pont de Nemours*, 637 F.3d at 453 (reversing dismissal of claim for attempted monopolization) (quoting *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992)).  "The existence and extent of market power may make the inference of specific intent from conduct more or less plausible."  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 927 (9th Cir. 1980) (reversing dismissal of conspiracy to monopolize claim).  However, contrary to HDA's suggestion, HDA Mem. at 22, a plaintiff "need not prove that the defendants succeeded or even came close to obtaining monopoly power or excluding any competitors" to maintain a conspiracy to monopolize claim.  *Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1175 (E.D. Va. 1995) (citing *Am. Tobacco Co.*, 328 U.S. at 789).

The Complaint pleads each required element for conspiracy to monopolize. It identifies substantial direct and indirect evidence of conspiracy. *See supra* Argument I B & C. It alleges that the conspirators had a specific intent to monopolize and asserts allegations of anticompetitive practices supporting an inference of intent to monopolize. Compl. ¶ 57. The allegation that HDA and its distributor members have conspired to mandate the use of Origin among its business partners—standing alone—supports a finding of specific intent to monopolize the market for track and trace compliance solutions. *Id.* ¶¶ 4, 49; *Full Draw*, 182 F.3d at 756 (holding that allegations of a group boycott supported a claim of conspiracy to monopolize). By including data restrictions in Origin's User and Contributor Agreements, HDA has taken additional anticompetitive conduct in furtherance of the conspiracy, *id.* ¶ 50-52, further supporting the inference of monopolistic intent. This same conduct constitutes overt acts that further the conspiracy to monopolize. And although not required to plead the claim, the Complaint alleges that HDA has market power in the market for track and trace compliance solutions, as evidenced by its ability to exclude competitors from the market. *Id.* ¶ 74.

HDA's efforts to describe TraceLink's conspiracy to monopolize claim as a form of monopoly leveraging evidences its misunderstanding of the law. Contrary to HDA's argument, the Complaint alleges that HDA's members, in reliance on their market power in the distribution market, conspired to monopolize the track and trace compliance solutions market. Compl. ¶¶ 74, 76, 78-79, 93-99. These joint efforts to conspire to monopolize a second market based on collective market power exercised in a related market violate antitrust law. *See, e.g.*, *Adv. Health-Care*, 910 F.2d at 142, 150 (reversing dismissal of claims for conspiracy to monopolize market for durable medical equipment in reliance on hospitals' "monopoly position in the acute care market"). In contrast, a monopoly leveraging claim involves unilateral action by a

monopolist to merely "gain an unwarranted competitive advantage" in a second market. *Id.* at

149. Monopoly leveraging is irrelevant to TraceLink's Section 2 conspiracy claim.[10]

## IV. The Complaint Alleges Facts Demonstrating TraceLink's Antitrust Injury.

TraceLink's Complaint specifically pleads that "HDA's anticompetitive conduct has

harmed and will continue to harm competition . . . *including competition from TraceLink,* by

precluding interoperability and significantly reducing the quality of compliance services on

which companies can rely" and "stunt[ing] continued innovations." Compl. ¶¶ 6-7, 78 (emphasis

added). It also pleads that this conduct has "had the effect of substantially foreclosing[]

competition" in track and trace products "including competition from plaintiff TraceLink."

*Id.* ¶ 1. Accordingly, the explicit allegations of the Complaint demonstrate that TraceLink's

injury flows from the injury to competition that the HDA conspiracy has caused. *See Blue*

*Shield of Va. v. McCready,* 457 U.S. 465, 483-84 (1992) (affirming Fourth Circuit finding that

plaintiff incurred antitrust injury). The Complaint does not merely allege "harm to

TraceLink." Def. Mem. at 26.

It is indeed axiomatic that competitors that are the victims of actions designed to

foreclose competition, such as TraceLink, have incurred antitrust injury. *See* II Areeda ¶ 348

("a rival clearly has standing to challenge the conduct of rival(s) that . . . tends to exclude rivals

from the market . . ."). *See also Palmyra Park Hosp., Inc. v. Phoebe Putney Mem. Hosp.,* 604

F.3d 1291 (11th Cir. 2010) (reversing dismissal Order and finding antitrust injury to competitor

in two competitor market); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-90 (6th Cir.

---

[10]      Notably, the Fourth Circuit has explicitly refused to reject claims of monopoly leveraging. *Adv. Health-Care*, 910 F.2d at 149 & n.17 (refusing to dismiss Section 2 claim and "[a]ssuming that monopoly leveraging constitutes a distinct § 2 violation").

2002) (affirming judgment and finding antitrust injury to competitor even though plaintiff's market share increased during damages period).

HDA argues that TraceLink's antitrust injury allegations are merely "conclusory." Def. Mem. at 25-26. But that is not the case. The Complaint specifies how TraceLink's Life Sciences Cloud product is patently superior to Origin—*see* Compl. ¶¶ 47-48, 79 (discussing the additional tracking information that Life Sciences Cloud provides that Origin does not and how Life Sciences Cloud, unlike Origin, accounts for "regulatory requirements . . . around the world")—and how, despite such superiority, the anticompetitive scheme has barred customers from utilizing Life Science Cloud. HDA's antitrust injury contentions should be rejected.[11]

## V.     The Complaint States Tortious Interference Claims.

The Complaint also states claims for tortious interference with TraceLink's actual and prospective business relations. "The elements required for a prima facie showing of the tort are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 844 (4th Cir. 2004) (quoting *Chaves v. Johnson*,

---

[11]     Authority relied on by HDA supports this conclusion. *See Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 316 (4th Cir. 2007) (affirming decision finding antitrust injury to plaintiff where defendant's conduct restricted entry to relevant market); *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 460-61 (E.D. Va. 2009) (finding antitrust injury where competitor "alleged that DuPont . . . actively excluded [it] from participation" in the relevant market). Other authority relied upon by HDA for its antitrust injury contentions is inapt. *See Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (affirming summary judgment where evidence indicated that plaintiff did operate in relevant market); *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 308 (S.D.N.Y. 2004) (granting summary judgment).

230 Va. 112, 120 (1985)).  While conduct that is illegal, "such as violations of statutes, regulations, or recognized common-law rules" constitutes "improper means" supporting intentional interference, improper methods falling short of illegal conduct also support a valid claim.  *Duggin v. Adams*, 234 Va. 221, 227 (1987).  "Methods also may be improper because they violate an established standard of a trade or profession . . . or involve unethical conduct . . . . Sharp dealing, overreaching, or unfair competition may also constitute improper methods."  *Id.* at 228.  HDA admits that "misuse of inside or confidential information" satisfies the "improper means" element of a tortious interference claim.  HDA Mem. at 28.

The Complaint sufficiently identifies a contractual relationship and expectancy supporting a claim of tortious interference.  For one, the Complaint sufficiently identifies relationships that HDA has interfered with, including relationships with suppliers and retailers that do business with distributor members of the HDA that have mandated the use of Origin, as well as current TraceLink's customers supporting open standards.  Compl. ¶¶ 49, 54.  HDA was, indeed, intimately aware of TraceLink's product and its customers; on more than one occasion TraceLink briefed customers on its product development and marketing strategies while members of the HDA Traceability Workgroup were present.  *Id.* ¶¶ 3, 45.

The Complaint's allegations also identify the improper methods that the HDA conspirators employed to intentionally interfere with TraceLink's relationships.  By intentionally imposing a mandate on their business partners to use Origin, HDA and its members interfered with TraceLink's existing and future contractual relationships.  *Id.* ¶¶ 49, 50.  Further, by designing Origin using product design information disclosed by TraceLink in confidence to

HDA Traceability Workgroup members, the HDA conspirators engaged in improper methods.

*Id.* ¶¶ 44, 45. These allegations state a claim for tortious interference.[12]

## CONCLUSION

For the foregoing reasons, plaintiff TraceLink respectfully requests that the Court deny Defendant's motion to dismiss.

January 12, 2018

By:  /s/ *J. Wyatt Fore*_____
**CONSTANTINE CANNON LLP**
Seth D. Greenstein (phv)
J. Wyatt Fore (VSB No. 89168)
1001 Pennsylvania Ave., NW
Suite 1300N
Washington, DC 20004
(202) 204-3500 (tel.)
(202) 204-3501 (fax)
wfore@constantinecannon.com

Matthew L. Cantor (phv)
Harrison McAvoy (phv)
335 Madison Avenue
New York, NY 10017
(212) 350-2700 (tel.)
(212) 350-2701 (fax)

*Counsel for Plaintiff,*
*TraceLink, Inc.*

---

[12]    Authority relied on by HDA is plainly inapplicable to the claims at issue. *See, e.g.*, *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 411-12, 415 (1997) (reversing dismissal based on court's imposition of additional requirement that plaintiff demonstrate malice). In *Masco Contractor Serv. East, Inc. v. Beals*, a counterclaim for tortious interference was dismissed because the counterclaimant did "not allege any specific occurrences of any conduct" and made "no mention of any particular contract." 279 F. Supp. 2d 699, 703, 710 (E.D. Va. 2003). Similarly, in *Gov. Emps. Ins. Co. v. Google, Inc.*, all plaintiff alleged was "a general expectancy that consumers will purchase [products] from [its] [w]ebsite." 330 F. Supp. 2d 700, 705 (E.D. Va. 2004). In stark contrast, here, the Complaint identifies TraceLink's business relationship, with customers and suppliers, and HDA's improper conduct.